**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Filippo SACCO aka John Rosselli,**
**Defendant-Appellant.**

**No. 24219.**

United States Court of Appeals,
Ninth Circuit.

June 17, 1970.

Rehearing Denied July 21, 1970.

each of the remaining counts, the latter to run concurrently with each other and with the first thirty days of the sentence on the first count. Count one charged failure to register as an alien in violation of 8 U.S.C. §§ 1302 and 1306(a); counts two through six charged five violations of 8 U.S.C. §§ 1305 and 1306(b), which require an alien annually to notify the Attorney General of his current address. We affirm. Viewing the evidence in the light most favorable to the government, we state the facts established at trial.

Between 1923 and 1940 the defendant, using the name John or Giovanni Rosselli, though with some variations in spelling, claimed several different dates and places of birth, all in the United States. Since 1940, the effective date of the sections of the United States Code requiring registration of aliens, the defendant has consistently claimed that he was born in Chicago on June 4, 1905. An entry in the Chicago Register of Births under the name of Giovanni Rosselli, supports his claim, but that entry was shown at trial to be a forgery. His earlier inconsistent claims were shown to be supported by similarly forged or false documents, or to be unsupported.

In fact, the defendant was born Filippo Sacco in Italy on July 4, 1905. He and his mother, Maria Sacco, entered this country as aliens in 1911 to join his father and her husband, Vincenzo Sacco, who had preceded them from Italy. The defendant attended school and lived in Boston until his arrests in 1922 and 1923 on federal narcotics and state grand larceny charges. He was never brought to trial on those charges because he jumped bail, changed his name to Rosselli, and fled to California. Both indictments were ultimately dismissed. The defendant's father, Vincenzo Sacco, remained an alien until his death in 1918; the defendant's mother registered as an alien in 1940, and filed annual alien reports until the time of trial. The defendant has never been formally naturalized, nor has he registered as an alien

Morris Lavine (argued), Los Angeles, Cal., for appellant.

David R. Nissen (argued), Chief, Special Prosecutions Division, Wm. Matthew Byrne, Jr., U. S. Atty., Los Angeles, Cal., for appellee.

Before BROWNING, DUNIWAY and HUFSTEDLER, Circuit Judges.

DUNIWAY, Circuit Judge:

A jury found the appellant guilty on all counts of a six-count indictment; he received a six-month sentence on the first count and a thirty-day sentence on

or filed annual alien reports for the years 1965–67.

After the trial started, and after the reception of much of the government's evidence, the defense announced its intention to rely on an entirely new source of citizenship, at least in the alternative. This was that even if the government was correct in its assertion that the defendant was Filippo Sacco (which defendant did not then but does now concede), he was still not an alien, because his mother had married a naturalized United States citizen, Liberato Cianciulli, in 1922. The defense offered to stipulate to much of Filippo Sacco's life history, as well as to the marriage of Maria Sacco and Liberato Cianciulli in 1922. The defense later introduced marriage records of the City of Boston showing that such a marriage took place on February 8, 1922. At the time of the marriage, citizenship by "derivation" was conferred on the minor children of alien women who married United States citizens by an 1855 statute, the Act of February 10, 1855, 10 Stat. 604, § 1994 Rev.Stat.U.S., repealed by Act of September 22, 1922, 42 Stat. 1022.[1] See United States v. Kellar, C.C.Ill.1882, 13 F. 82.

The government countered this new line of defense by attempting to show that the marriage of the defendant's mother had not conferred citizenship under the 1855 Act either on her, or by derivation from her, on the defendant as her minor child. Cianciulli had a wife living in Italy at the time of the marriage; they married in order to legitimate a daughter born out of wedlock in 1920 rather than with the intention of living together as man and wife; the couple, who had been living together out of wedlock, had separated well before the marriage and never lived together again. Shortly after the marriage, Cianciulli departed permanently for Italy, but Maria stayed here. Her 1940 alien registration stated that she had never had a married name other than Sacco. Thus she never claimed citizenship conferred by the marriage.

1. *The effect of 8 U.S.C. § 1451(a) and (e).*

The defendant's chief line of argument is that once derivative citizenship has been acquired by virtue of a presumptively valid marriage, it may be removed only as provided by Congress in 8 U.S.C. § 1451(a) and (e). He says that to remove citizenship in a criminal trial by means of a collateral attack on the validity of the marriage of his mother is a denial of due process and beyond the power of Congress.[2]

The flaw in this argument is that to benefit from it the defendant must first establish that he is a citizen. At trial the issue finally joined was whether the Sacco-Cianciulli marriage had succeeded in conferring citizenship on Maria Sacco, and therefore on her minor son the defendant, in the first place. Section 1451 deals with proceedings brought "for the purpose of revoking and setting aside the order admitting such person to citizenship and cancelling the certificate of naturalization * * *." Read literally, it cannot apply here. There never was an order admitting either the defendant or his mother to citizenship; no certificate of naturalization was ever issued to either of them. If the defendant's mother became a citizen, it was by virtue of the marriage alone, and it was only if she was married to a citizen that the defendant could derive citizenship from

---

1. The statute provided in part:
   "That any woman who might lawfully be naturalized under the existing laws, married, or who shall be married to a citizen of the United States, shall be deemed and taken to be a citizen."

2. Defendant's constitutional arguments rely on Afroyim v. Rusk, 1967, 387 U.S.

253, 87 S.Ct. 1660, 18 L.Ed.2d 757; Costello v. United States, 1958, 356 U.S. 256, 78 S.Ct. 714, 2 L.Ed.2d 741; Trop v. Dulles, 1958, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630; United States v. Zucca, 1956, 351 U.S. 91, 76 S.Ct. 671, 100 L.Ed. 964.

her. The government sought to show that there had been no valid marriage; if it did so, then there was no citizenship conferred on anyone, and hence no "naturalization." We find nothing in section 1451 or in the cited cases which prevents the government from attacking the validity of the marriage.

2. *The validity of the "marriage" of the defendant's mother.*

At trial, the government took the position that the jury had evidence before it on the basis of which it could conclude that the presumption of validity which attaches to a ceremonial marriage had been overcome on either of two theories. First, it asked the court to instruct the jury that it should conclude that the defendant was not a citizen if it found that Cianciulli had a wife living at the time of his marriage to Maria Sacco, and that it made no difference whether or not Maria Sacco was ignorant of the impediment; the marriage was "void" and not merely "voidable" in Massachusetts. Second, the government asked that the jury be instructed to conclude that the defendant was an alien if it found that Maria Sacco and Cianciulli had married solely for the collateral purpose of legitimating their daughter and with no intention of assuming the relationship of husband and wife.

The defendant's trial counsel objected to the instructions based on both theories, but the trial court gave the instruction set out in the margin.[3] The jury was instructed in the alternative and may have arrived at its conclusion that the defendant was an alien by either of the two routes permitted by the instruction. There was a general verdict, so that an error in either alternative would normally require reversal. We cannot tell which ground the jury may have relied upon.

However, defendant's appellate counsel does not argue that the district court erred in allowing the jury to conclude that the defendant was an alien on the second ground. He does include in his list of issues on appeal: "Whether the court erred in instructions given and refused?" and sets out the instruction quoted above in full. But he then says:

"This was prejudicial error, since the status of the mother's marriage could not be attacked in attacking the defendant's derivative citizenship other than in the manner provided by the Immigration Code, and this was not done."

The supplementary matter filed by him after oral argument on appeal relates only to the portion of the instruction dealing with the first ground—that the marriage was bigamous.

3. "[The presumption of the validity of a marriage] continues in force until overcome by the evidence to the contrary as you have been advised previously in these instructions.

Under the law of Massachusetts a marriage ceremony is void if either party has a living spouse and a previous marriage has not been terminated by annulment or divorce.

In order to establish that the defendant is an alien, the burden is upon the Government to prove either one of two things concerning the marriage of Maria Sacco and Liberato Cianciulli:

1. That the marriage between Maria Sacco and Liberato Cianciulli was void in that at the time of the marriage ceremony between Liberato Cianciulli and Maria Sacco in Boston on February 8, 1922, as evidenced by Exhibit F, Liberato Cianciulli was married to another person and that such person's previous marriage had not been terminated by annulment or divorce, that the prior spouse was then living on that date; or

2. It is necessary for the Government to prove that the marriage ceremony between Liberato Cianciulli and Maria Sacco in Boston on February 8, 1922 was not entered into with the good faith intention to assume the relationship of husband and wife, but was entered into for a collateral purpose.

But if you find that the marriage was void as above stated, or was not entered into with such good faith and intentions, then you are instructed that neither Maria Sacco nor her minor child Filippo secured derivative citizenship but that both remained as aliens."

Defendant's trial counsel did object to the instruction, originally on the ground that there was insufficient evidence before the jury on the question, and later as follows:

"there is absolutely no evidence from which this jury could find, or there is no evidence whatsoever that these people married in bad faith within the meaning of those cases cited by counsel, to wit, that they married for the purpose of avoiding the immigration and naturalization laws.

"The jury cannot speculate in the absence of evidence and the fact of the matter is they proved that Mrs. Sacco has been registered as an alien since 1940."

He also lodged an objection to the court's refusal to instruct that the purpose to legitimate an illegitimate child was a lawful and proper purpose for marriage. Because error in the instruction, as to either ground, would require reversal, we conclude that, in the interest of justice, we should consider the propriety of both of the two grounds stated in the instruction as a basis for finding that defendant is an alien.

### a. *Bigamous marriage.*

There is evidence in the record on the basis of which the jury could have found that on the date of the marriage in question, Cianciulli had another wife living, that his marriage to her had never been dissolved by divorce or annulled, and that his wife, Liberata, lived until 1929. Moreover, there is evidence that Cianciulli married again in 1931, although the "marriage" to defendant's mother had never been dissolved.

■ The general rule is that the validity of a marriage is determined by the law of the state where it took place. See Loughran v. Loughran, 1934, 292 U.S. 216, 223, 54 S.Ct. 684, 78 L.Ed. 1219; Yarbrough v. United States, 1965, 341 F.2d 621, 169 Ct.Cl. 589. The Massachusetts General Laws, Chapter 207, Sections 4, 6, 8, provide in relevant part:

§ 4. "A marriage contracted while either party thereto has a former wife or husband living, except as provided in section six * * * shall be void."

§ 6. "If a person, during the lifetime of a husband or wife with whom the marriage is in force, enters into a subsequent marriage contract with due legal ceremony and the parties thereto live together thereafter as husband and wife, and such subsequent marriage contract was entered into by one of the parties in good faith, in the full belief that the former husband or wife was dead, that the former marriage had been annulled by a divorce or without knowledge of such former marriage, they shall, after the impediment to their marriage has been removed by the death or divorce of the other party to the former marriage, if they continue to live together as husband and wife in good faith on the part of one of them, be held to have been legally married from and after the removal of such impediment, and the issue of such subsequent marriage shall be considered as the legitimate issue of both parents."

§ 8. "A marriage solemnized within the commonwealth which is prohibited by reason of consanguinity or affinity between the parties, or of either of them having a former wife or husband living, shall be void without a decree of divorce or other legal process."

See Puzo v. Puzo, 1961, 342 Mass. 775, 173 N.E.2d 268. In Hopkins v. Hopkins, 1934, 287 Mass. 542, 192 N.E. 145, where the children of a bigamous union were seeking to inherit under an intestate statute from their father, the court said:

"[The bigamous ceremony] was invalid and gave no color of legitimacy to the children born prior thereto." (192 N.E. at 148.)

There, it was only the effect given by section 6 to the death of the first wife, 25 years later, that legitimated the children, although their mother and father have lived as husband and wife for all that time and until the mother's death one year after the first wife's death. Here the parties to the marriage never

lived together after the marriage, much less after the death of Liberato's wife, Liberata, in 1929.

Numerous cases interpreting the words "wife," "widow" and "children" in various federal statutes conclude that bigamous marriages fail to confer those statuses. See Lawson v. United States, 2 Cir., 1951, 192 F.2d 479, cert. denied, 343 U.S. 904, 72 S.Ct. 635, 96 L.Ed. 1323, and the cases cited there, 192 F.2d at 481 n. 5; Bell v. Tug Shrike, 4 Cir., 1964, 332 F.2d 330, cert. denied, 379 U.S. 844, 85 S.Ct. 84, 13 L.Ed.2d 49.

■ We conclude that the first ground stated in the instruction is correct.

b. *Marriage ceremony entered into without any intention of parties to live together as husband and wife.*

The instruction refers to a marriage entered into for a collateral purpose, but does not state what that purpose may have been. The only such purpose suggested by the record was to legitimate an illegitimate daughter of Cianciulli and defendant's mother. Nothing in the record suggests that the purpose was to confer citizenship on anyone, and the instruction does not mention such a purpose.

A Massachusetts court has held that a marriage entered into for a collateral purpose is not even voidable, much less void. See Hanson v. Hanson, 1934, 287 Mass. 154, 191 N.E. 673 (sole purpose of marriage was retention of employment position and salary increase). We find no Massachusetts case involving a marriage entered into only to legitimate a child, but a number of courts in other states have refused annulments sought by parties to such marriages, even where they had agreed in advance not to live together and to seek an annulment. See Schibi v. Schibi, 1949, 136 Conn. 196, 69 A.2d 831, 14 A.L.R.2d 620; Erickson v. Erickson, Sup.1944, 48 N.Y.S.2d 588; Wagner v. Wagner, 1947, 59 Pa.Dist. & Co.R. 90; Bove v. Pinciotti, 1942, 46 Pa. Dist. & Co.R. 159; Campbell v. Moore,

1939, 189 S.C. 497, 1 S.E.2d 784. On the other hand, some courts have held such marriages voidable. See Conley v. Conley, 1943 Ohio Com.P., 28 Ohio Ops. 289, 14 Ohio Supp. 22, which granted an annulment, noting that state law made the child legitimate despite the annulment and thus no purpose could be served by refusing it. No case has been brought to our attention holding such a marriage void. The general rule is that a voidable marriage is considered valid until it is annulled, and cannot be collaterally attacked, 35 Am.Jur., Marriage, §§ 57, 58, pp. 220–221. And there is no evidence that defendant's mother's marriage to Cianciulli was ever annulled. If that principle is applicable here, then the second ground stated in the instruction is erroneous.

In Lutwak v. United States, 1953, 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593, the Supreme Court was called upon to construe the so-called War Brides Act, 59 Stat. 659, formerly 8 U.S.C. § 232. That Act provided that, notwithstanding certain laws, regulations, Executive orders, or Presidential proclamations, " * * * alien spouses * * * of United States citizens serving in, or having an honorable discharge certificate from the armed forces * * * during the Second World War shall, if otherwise admissible * * * be admitted to the United States * * *." To be admitted under the Act, it was necessary that the alien be a "spouse" of, that is, married to, the appropriate citizen. In that respect, the War Brides Act is closely akin to the Act of 1855, which requires that the alien be "married" to a citizen.

In *Lutwak*, three persons were convicted of conspiring to defraud the United States by bringing about ceremonial marriages, in Paris, between honorably discharged veterans and aliens, and by then telling the immigration authorities that the alien was married to the serviceman or woman. It was "part of the plan that the marriages were to be in form only, solely for the purpose of enabling * * * [the aliens] to enter the United States. The parties to the marriages

were not to live together as husband and wife, and thereafter would take whatever legal steps were necessary to sever the legal ties." (344 U.S. at 607, 73 S.Ct. at 484). The plan was carried out, and three aliens thus obtained entry into the United States.

On appeal, it was argued that the marriages were valid under French law (there was no evidence to the contrary) and that the court erred in instructing the jury

"that 'if the subjects agree to a marriage only for the sake of representing it as such to the outside world and with the understanding that they will put an end to it as soon as it has served its purpose to deceive, they have never really agreed to be married at all.'" (344 U.S. at 610–611, 73 S.Ct. at 486)

The Court disposed of this contention as follows:

"We do not believe that the validity of the marriages is material. No one is being prosecuted for an offense against the marital relation. We consider the marriage ceremony only as a part of the conspiracy to defraud the United States and to commit offenses against the United States. In the circumstances of this case, the ceremonies were only a step in the fraudulent scheme and actions taken by the parties to the conspiracy. By directing in the War Brides Act that 'alien spouses' of citizen war veterans should be admitted into this country, Congress intended to make it possible for veterans who had married aliens to have their families join them in this country without the long delay involved in qualifying under the proper immigration quota. Congress did not intend to provide aliens with an easy way of circumventing the quota system by fake marriages in which neither of the parties ever intended to enter into the marital relationship; that petitioners so believed is evidenced by their care in concealing from the immigration authorities that the osten-

sible husbands and wives were to separate immediately after their entry into this country and were never to live together as husband and wife. The common understanding of a marriage, which Congress must have had in mind when it made provision for 'alien spouses' in the War Brides Act, is that the two parties have undertaken to establish a life together and assume certain duties and obligations. Such was not the case here, or so the jury might reasonably have found. Thus, when one of the aliens stated that he was married, and omitted to explain the true nature of his marital relationship, his statement did, and was intended to, carry with it implications of a state of facts which were not in fact true.

"Because the validity of the marriages is not material the cases involving so-called limited-purpose marriages [citing Schibi v. Schibi, supra, and Hanson v. Hanson, supra] cited by petitioners to support their contention that the marriages in the instant case are valid, are inapplicable. * * *" [344 U.S. at 611–612, 73 S.Ct. at 486]

We hold that the foregoing principles are applicable here. We conclude that the effect of Lutwak is to add to the requirement that the marriage be valid where performed an additional, federal, requirement, that the parties must have intended that the marriage be one falling within the Court's definition of the common understanding of marriage.

It is true that in Lutwak the collateral purpose for going through the marriage ceremony was to take advantage of the War Brides Act, while in the present case the collateral purpose was to legitimate a child rather than to take advantage of the Act of 1855. But if, as the Court held in Lutwak, the Congress had in mind "the common understanding of marriage" when it made provision for alien "spouses" in the War Brides Act, we think it must be equally true that it had in mind the same "common understanding of marriage" when it made provision for an alien woman "married" to

a citizen of the United States in the Act of 1855. Indeed, if Congress did not intend to confer the boon of entry into the United States upon aliens who went through what the Court described in *Lutwak* as "spurious, phony marriages" (344 U.S. 609, 73 S.Ct. 481) and as "sham, phony, empty ceremony" (id. at 615, 73 S.Ct. 481), how much less likely is it that, by the Act of 1855, the Congress intended to confer the boon of citizenship upon a woman entering into such a marriage? It is also true that in *Lutwak* the Court did not have before it the question whether the aliens there involved were entitled to enter the United States under the War Brides Act, in spite of the fraud in which they had participated. But the *Lutwak* rationale makes it impossible for us to believe that the Court would have held that they did have a right to enter. See also United States v. Rubenstein, 2 Cir., 1945, 151 F. 2d 915, 918–919, cert. denied, 326 U.S. 766, 66 S.Ct. 168, 90 L.Ed. 462. The jury instruction given by the trial judge in *Lutwak* is a quotation from Judge Learned Hand's opinion in Rubenstein.

■ We hold that it was not error to include the second ground in the instruction.

3. *Self-incrimination.*

■ Defendant argues that 8 U.S.C. §§ 1302, 1305, 1306(a) and 1306(b) violate his right against self-incrimination. However, the alien registration statutes are "essentially non-criminal and regulatory" provisions, Marchetti v. United States, 1968, 390 U.S. 39, 57, 88 S.Ct. 697, 19 L.Ed.2d 889. Compare Shapiro v. United States, 1948, 335 U.S. 1, 68 S.Ct. 1375, 92 L.Ed. 1787; United States v. Sullivan, 1927, 274 U.S. 259, 47 S. Ct. 607, 71 L.Ed. 1037. See also United States v. Toussie, 2 Cir., 1969, 410 F.2d 1156, 1159–1160, rev'd on other grounds *sub nom.* Toussie v. United States, 1970, 397 U.S. 112, 90 S.Ct. 858, 25 L.Ed.2d 156 and the dissenting opinion of Mr. Justice·White at 133–134, 90 S.Ct. 858; Davidowitz v. Hines, M.D.Pa., 1939, 30 F.Supp. 470, 475–476, aff'd, 1941, 312 U.S. 52, 73–74, 61 S.Ct. 399, 85 L.Ed. 581.

The defendant makes no effort to explain in what way complying with any of those statutes would have tended to incriminate him.

4. *Due process.*

The defendant further argues that the alien registration statutes are unconstitutional restrictions on the rights of aliens to travel within the United States. Again, he makes no effort to explain in what manner those sections restrict travel.

■■ The defendant argues that he was denied due process and equal protection of the laws in that he was singled out and relentlessly investigated because of his suspected complicity in other, unrelated crimes. The conscious exercise of selectivity in enforcement is not in itself a constitutional violation where it is not further alleged that "the selection was deliberately based upon an unjustifiable standard such as race, religion or other arbitrary classification." Oyler v. Boyles, 1962, 368 U.S. 448, 456, 82 S.Ct. 501, 7 L.Ed.2d 446. Here, selection of this defendant for intensive investigation was based on his suspected role in organized crime (in addition to the two charges in Boston, Rosselli had a long history of arrests followed by dismissals in California—ten between 1924 and 1932—and served three years and five months of a ten-year sentence following a federal conviction of conspiracy to interfere with interstate trade and commerce by coercion, threats and violence in 1943). It cannot be said that that standard for selection is not rationally related to the purposes of the various criminal laws for violation of which Rosselli was being investigated, including the alien registration laws.

5. *Confrontation.*

■ The defendant argues that he was denied his Sixth Amendment right to confront the witnesses against him. The evidence to which he now objects was admitted under well-recognized exceptions to the hearsay rule. The use of

certified public records to prove events, without producing the officials who recorded them, falls within such an exception. The defense did not object at trial to the admission of those documents, but merely requested a continuance to make an independent investigation in Italy, which was granted.

The signed statement of defendant's mother falls within another such well-recognized exception, declarations concerning family history. See Cal.Evid. Code § 1310 (West 1966); Ex parte Delaney, 72 F.Supp. 312, 323 (S.D.Cal. 1947), aff'd *sub nom.* Carmichael v. Delaney, 9 Cir., 1948, 170 F.2d 239. The witness was unavailable. The prosecution made a series of efforts, the last one during trial, to arrange for her presence at trial as a witness and to depose her. Her own doctor's medical excuses were accepted until the time of trial, when the trial judge ordered a medical examination after the prosecutor informed the judge of several instances of behavior inconsistent with her doctor's statements. It was determined that she was unfit to travel. The defense then arranged for a deposition during trial on condition Mrs. Sacco's doctor could end the questioning whenever he thought her physical condition indicated it; he did, just as cross-examination was getting warm, and the trial judge refused to admit parts of her testimony.

### 6. *Willfulness and knowledge.*

■ The defendant asserts that "guilty knowledge" was an element of the crime and was not proved. The jury was instructed that under each count it must find willfulness:

"With respect to the crime charged in each count of this indictment, * * * willfulness must be proved beyond a reasonable doubt, that is to say, specific intent must be proved before there is a conviction.

"Specific intent, as the term itself suggests, requires more than a mere general intent to engage in certain conduct.

"A person who knowingly does an act which the law forbids or knowingly fails to do an act which the law requires, intending with evil motive or bad purpose either to disobey or to disregard the law, may be found to act with specific intent."

There was sufficient evidence in the record to support the jury's verdict on this element of the offense.

### 7. *Prejudicial evidence.*

■ Defendant argues that the government evidence admitted to refute his various false claims to birth in this country constituted "a great mass of highly prejudicial evidence." He argues that his choice at trial to rely for citizenship exclusively on his mother's remarriage made that evidence "irrelevant and immaterial to the issues. * * *" However, it is sufficient answer to these contentions that the falsity of those claims to native birth, and the fact that the defendant was actually born Filippo Sacco in Italy, were not formally conceded until final argument. Only as he was reading his instructions to the jury did the judge eliminate the instruction relevant to the issues of identity. The defendant's offer to stipulate to various facts about Filippo Sacco's early history did not extend to an offer to stipulate that the defendant was Filippo Sacco. Moreover, much of the evidence of which counsel now complains remained relevant to prove specific intent.

### 8. *Wire-tapping.*

Defendant's final contentions relate to a post-conviction hearing as to whether any of the government's evidence was tainted by admittedly trespassory surveillance, and whether the defense should have been allowed additional discovery beyond the materials supplied by the government.

After a hearing, the trial court found that all existing evidence obtained by the government had been supplied to the court and the defendant and that none of that information had been used, or had furnished leads to information that had been used, at trial. The court also

found that the original tapes had been routinely destroyed. Both the defendant's suppression motion and his discovery motion were denied.

The defendant's objections to those rulings seem to fall into two groups. First, he suggests that the trial court relied on an *in camera* inspection of materials that were unavailable to the defense, and that this procedure denied him due process and equal protection of the laws. The government asserted that the copy of the material derived from illegal surveillance that the government supplied to the defense was complete except for (1) the names of the persons who made the logs and (2) material not obtained from electronic surveillance that was "not in any way even remotely connected with this case." The trial judge did not say either in his order or at the hearing that he had fully verified that assertion through *in camera* inspection of the unexcised copy supplied him. We are invited to do so.

These trial court proceedings were consonant with the Supreme Court opinion in Alderman v. United States, 1969, 394 U.S. 165, 180–187, 89 S.Ct. 961, 22 L.Ed. 2d 176. See also Desist v. United States, 1969, 394 U.S. 244, 246–247 n. 5, 89 S.Ct. 1030, 22 L.Ed.2d 248. The defendant's counsel were given an opportunity to examine the products of the surveillance for themselves in an adversary proceeding, and were unable to find any source of taint. See also Taglianetti v. United States, 1969, 394 U.S. 316, 317, 89 S.Ct. 1099, 1101, 22 L.Ed.2d 302:

"Nothing in *Alderman* * * * requires an adversary proceeding and full disclosure for resolution of every issue raised by an electronic surveillance. * * * Here the defendant was entitled to see a transcript of his own conversations and nothing else. He had no right to rummage in government files."

The defendant's second objection concerns the timing of the hearing. Shortly before trial the defense was served with a "Memorandum Disclosing Electronic Surveillance" and representing both that the prosecutor had not had access to any of the information from the surveillance and that it had no "possible bearing on or relevance to" the defendant's prosecution. The government also represented that:

"1. Its case in trial will not rely upon tainted evidence or any clues or leads derived therefrom and the Government will be able amply to demonstrate this at a posttrial hearing.

2. A pretrial hearing is likely to be of considerable duration, and the need for it would be obviated if defendant is acquitted.

3. At a pretrial hearing only a hypothetical or tentative case could be presented, and all questions and answers given at the trial could not be fully anticipated. Nor would the court be able to ascertain the constitutional purity of the Government's potential cross-examination of defense witnesses and defendant Sacco himself.

4. A pretrial hearing would inevitably amount to an unrestricted discovery of the Government's case.

5. A pretrial hearing in this case would probably attract extensive publicity and may prejudice defendant's right to a fair trial."

The trial judge denied the defense motions for a pretrial hearing on suppression and discovery motions relating to the electronic surveillance. Both inquiries were postponed until after trial. Before the hearing took place, a hearing on electronic surveillance in the related Friars Club case was held, and evidentiary portions of that hearing were made part of the record in this case by stipulation.

Other district courts have granted motions to postpone suppression hearings until after trial. See, *e. g.*, United States v. Birrell, S.D.N.Y., 1967, 269 F.Supp. 716. Where there has been no hearing at all in the trial court because the surveillance first came to the attention of the defense after trial, the Supreme Court has repeatedly indicated that a post-trial hearing is the proper

remedy. See Desist v. United States, *supra*, 394 U.S. at 246–247 n. 5, 89 S.Ct. 1030; Kolod v. United States, 390 U.S. 136, modified on rehearing *sub nom.* Alderman v. United States, *supra*, 394 U.S. 165, 89 S.Ct. 961; Hoffa v. United States, 1967, 387 U.S. 231, 233–234, 87 S.Ct. 1583, 18 L.Ed.2d 738. We hold that the decision of the trial judge as to the timing of the hearings was within his discretion, and not an abuse of it.

The defendant's counsel does not claim error in the denial of his post-trial discovery motion. Nor does he object to the district court's rulings on the scope of his cross-examination of the F.B.I. agent who was in charge of the "Rosselli file." We find no error.

Affirmed.