MATTER OF YAU

In Deportation Proceedings

A-15774083

*Decided by Board March 19, 1974*

(1) Under the alien registration provisions of the Immigration and Nationality Act and applicable regulations, an alien crewman is under a duty to exhibit his crewman's landing permit upon request to do so by a Service officer, without necessity of a *Miranda*—type warning, even after the alien has been temporarily detained by the officer for interrogation in accordance with the provisions of section 287(a)(1) of the Act, since the alien registration provisions are essentially non-criminal and regulatory.

(2) Respondent was placed under forcible restraint by a Service officer for a brief period (between 5 and 10 minutes) for future interrogation; thereafter he was accompanied by a Service officer to his living quarters where, upon request, and while under no physical restraint, he voluntarily handed over to the Service officer his crewman's landing permit (Form I—95A). *Held:* The temporary forcible detention of respondent for future questioning was not a "full-blown" arrest without warrant pursuant to section 287(a)(2) of the Act and did not continue throughout the period when respondent was in his own living quarters and was questioned by the Service officer. Hence, since respondent's crewman's landing permit was not obtained in a custodial setting and a *Miranda*—type warning was not required, it is admissible in evidence.

CHARGE:

Order: Act of 1952—Section 241(a)(2) [8 U.S.C. 1251(a)(2)]—Nonimmigrant—remained longer crewman.

ON BEHALF OF RESPONDENT:
Jules E. Coven, Esquire
1 East 42nd Street
New York, New York

ON BEHALF OF SERVICE:
Thomas W. Winnerman
Trial Attorney
R. A. Vielhaber
Appellate Trial Attorney

This is an appeal by the Immigration and Naturalization Service from a decision of an immigration judge which ordered the termination of deportation proceedings against a person named Yau Cheung Cheong in the Order to Show Cause in which he had been charged with having illegally remained in the United States beyond the period of his temporary admission as an alien crew-

man. Additionally, the immigration judge certified the matter to us for final decision.

The appeal will be sustained. We find that the hearing before the immigration judge was fair, and that the deportability of Yau Cheung Cheong, to whom we shall hereafter refer as the respondent, has been established by clear, convincing, and unequivocal evidence.

On June 5, 1969, the Service gained information as to the respondent's name, other personal data, and the date and manner of his arrival in the United States, as a crewman, when the respondent, pursuant to a request made by a Service investigator, handed to him a crewman's landing permit, Form I—95A. On the basis of that information the District Director at Newark, New Jersey, obtained from the Houston, Texas, office of the Service further information concerning the respondent, including a report of his desertion from the ship on which he had arrived in this country, and his Hong Kong Seaman's Identity Book. All the documents in the file pertainng to the respondent at the Houston office had been maintained there long before June 5, 1969.

During the hearing held before the immigration judge the respondent stood mute, on advice of counsel, and invoked the privilege against self-incrimination under the Fifth Amendment of the United States Constitution.

All the pertinent facts were set forth by the immigration judge in his decision of April 5, 1971. We quote from it the following two paragraphs:

"Factually, I am advised through the testimony of the investigators of the Immigration and Naturalization Service who appeared before me that the male person whom they identified as the respondent appearing in this cause was seen by one officer running out of the rear door of a restaurant in Verona. New Jersey, clad at that time in a white uniform, the usual attire for restaurant kitchen employees. It was the investigator's opinion that the man was attempting to flee from other officers of the Immigration and Naturalization Service who were in the restaurant allegedly interviewing and investigating the personnel there in an effort to ascertain whether there were any illegal aliens employed in the restaurant. The investigator who saw the male person fleeing gave chase, ultimately caught him, physically restained him, placed handcuffs upon him, and brought him to a Service owned vehicle, which was parked near the restaurant, where this officer turned the male person over to another officer. The male person was then placed in the rear of the car and detained there for some fifteen or twenty minutes before he and other persons found at the restaurant were taken to the living quarters for employees provided by the restaurant some few hundred yards to the rear of the restaurant. At this place, through an interpreter, an Immigration Service Investigator requested from the male person his 'papers' and obtained the Form I—95A which has been marked Exhibit 2 for Identification.

The apprehending Immigration officer reported the information contained upon this Form I—95A to his supervisor at the offices of the Immigration and

631

Naturalization Service in Newark, and this officer, in turn, then requested and obtained, based upon this information, an Immigration file which purportedly related to the person to whom the Form I—95A had been issued. The other documents offered in evidence and marked solely for Identification came from this Immigration file."

In his decision, the immigration judge further stated that the respondent was placed under arrest when handcuffs were put upon him, that, thereafter, it became incumbent upon the arresting officer to give a *Miranda*—type warning to the respondent, as required under *Miranda* v. *Arizona*, 384 U.S. 436 (1966), before the officer could request or obtain from respondent any evidence which could be used against him in a subsequent proceeding, and that the failure to give such a warning rendered evidence obtained thereafter inadmissible. He stressed the fact that, under Service instructions, Service investigators were required to give *Miranda*—type warnings, and that noncompliance with such instructions was an additional reason for considering evidence obtained in violation of those instructions to be inadmissible. He cited the case of *Bridges* v. *Wixon*, 326 U.S. 135, 153 (1945). He failed to mention the significant facts that the respondent was under no physical restraint at the time when he handed his crewman's landing permit (Form I—95A) to a Service officer (Tr., p. 19), that he did so voluntarily, and that no search was made.

In view of counsel's contention that the respondent was subjected to an illegal arrest, we have examined the record for any violation of the provisions of the Fourth Amendment to the constitution of the United States which might possibly preclude the admission in evidence of respondent's crewman's landing permit and of documents in the possession of the service which pertain to the respondent. We have found no such violation.

The Fourth Amendment affords protection against unreasonable searches and seizures. Here there was no search; but there was a "seizure" of the person of the respondent when he was placed in the Service-owned vehicle, and was handcuffed. We find that the seizure of the respondent's person was reasonable, in view of his unusual conduct. In making that finding we have relied on *Terry* v. *Ohio*, 392 U.S. 1 (1968), in which the United States Supreme Court sanctioned a person's seizure and search, by a police officer, under not dissimiliar factual circumstances. This respondent was held in a motor vehicle for future questioning for between five and ten minutes (Transcript of Hearing before the immigration judge, p. 22). Such a detention for future interrogation, if brief in duration, has been distinguished from a "full—blown" arrest. *Au Yi Lau* v. *INS*, 445 F.2d 217 (D.C. Cir., 1971), cert. den. 404 U.S. 864 (1971). Under the circumstances, the respondent's

forcible detention during a five-to-ten-minute period was a reasonable, constitutionally unassailable and under section 287(a)(1) of the Immigration and Nationality Act, authorized investigatory stop for a reasonable period of time, and was not a "full—blown" arrest without warrant pursuant to section 287(a)(2) of the Immigration and Nationality Act.

The respondent was not questioned while he remained in the Service vehicle. There was a language barrier. He could not speak English well enough; and the Service officers did not speak Chinese. Since the respondent was not questioned during his stay in the Service vehicle, and no document was obtained from him during that time, there would have been no occasion for giving him a *Miranda*—type warning; and, of course, none could have been given in view of the lack of communication. We therefore do not have to, and do not, decide the question whether a *Miranda*—type warning would have been required if any statements had been taken from the respondent or if any documents had been obtained from him, at that time. We find on this record that the restraint placed upon the respondent, as a necessary and reasonable concomitant of his detention, was temporary in nature, and did not continue up to the time when he handed his copy of the crewman's landing permit (Form I—95A) to the Service officer. The record (Tr., pp. 18–20) indicates that he did so in a noncustodial setting. He had been asked, through a fellow employee, whether he had a "ship's pass," and had indicated that he had one. He had then led the Service officer to his room, had found the document in question, namely his copy of the crewman's landing permit, and, in his own living quarters, had voluntarily handed it to the Service officer. In view of those facts, we disagree with the immigration judge's assumption that there had been an arrest of the respondent pursuant to section 287(a)(2) of the Immigration and Nationality Act, rather than a temporary detention for the purpose of interrogation under section 287(a)(1), and with the immigration judge's further conclusion that the restraint imposed upon the respondent through an assumed "full—blown" arrest under section 287(a)(2) continued throughout the period when the respondent was in his own living quarters. We find that the production, by the respondent, of his copy of the crewman's landing permit did not take place in a custodial setting, and that, under the circumstances of this case, a *Miranda*—type warning was not required any more than in *Matter of Lane*, 13 I. & N. Dec. 632, (BIA 1970), where we said the following:

"Such warning is required in a custodial setting or when the person questioned is the subject of a criminal investigation. Neither of these situations existed here. There was merely an on-the-scene interrogation,

reasonable in nature, relatively short in duration, and there was an absence of a reasonable possibility that there would be a criminal prosecution."

Even if, contrary to our foregoing finding, the respondent's copy of this crewman's landing permit had been procured by the Service officer in a custodial setting, the Service appeal would have to be sustained.

We are unable to concur in the immigration judge's conclusion that the respondent's copy of the crewman's landing permit (Form I—95A) was obtained from the respondent in violation of Service instructions. The respondent had referred to the principle that "one under investigation with a view to deportation is legally entitled to insist upon the observance of rules promulgated ... pursuant to law." *U.S. ex rel. Bilokumsky v. Tod,* 263 U.S. 149, 155 (1923), *Bridges* v. *Wixon,* 326 U.S. 135, 153 (1945). The following provisions of 8 CFR 287.3 were in existence at the time when the respondent handed the Form I—95A to the Service officer:

> "An alien arrested without warrant of arrest shall be advised of the reason for his arrest and his right to be represented by counsel of his own choice, at no expense to the Government. He shall also be advised that any statement he makes may be used against him in a subsequent proceeding and that a decision will be made within 24 hours or less as to whether he will be continued in custody or released on bond or recognizance."

However, like the preceding provisions of section 287.3, the quoted portion deals exclusively with arrests without warrant, under subsection (a)(2) of section 287 of the Immigration and Nationality Act. It does not relate to a brief detention of a person believed to be an alien, under subsection (a)(1) of the Immigration and Nationality Act. In this case, there was only a brief detention. There was no full-blown arrest without warrant. We therefore reject the respondent's contention that there was a violation, by the Service, of the provisions of 8 CFR 287.3.

In support of his view that a *Miranda*—type warning should have been given to the respondent, the immigration judge relied on a statement in footnote 2 of a memorandum of the Immigration and Naturalization Service filed in the Supreme Court of the United States in connection with its opposition to the granting of a petition for a writ of certiorari in the case of *Au Chiu Pang* v. *INS*, No. 1081 Misc., October Term 1966, which was reported below at 368 F.2d 637(C.A. 3, 1966), and in which certiorari was thereafter denied, 386 U.S. 1037 (1967). There, however, the Solicitor General referred to situations where an alien was *"formally interrogated with respect to an entry believed to be illegal"* [emphasis supplied]. There was no such formal interrogation in the matter which is now before us.

Under section 264(e) of the Immigration and Nationality Act,

"Every alien, eighteen years of age and over, shall at all times carry with him and have in his personal possession any certificate of alien registration or alien registration receipt card issued to him pursuant to subsection (d)." In enacting that statute, Congress could hardly have intended that an alien was merely required to carry the document with him, but did not have to exhibit it to a Service officer asking him to identify himself. Pursuant to the authority granted to him in section 263(a) of the Immigration and Nationality Act the Attorney General has provided for the registration of alien crewmen and for the issuance of alien crewmen landing permits (Forms I—95). 8 CFR 264.1(a) and (b). We hold that, under the statute and the applicable regulations, an alien crewman is indeed under a duty to exhibit his crewman's landing permit when requested to do so by a Service officer, even after the alien has been temporarily detained by the officer for interrogation in accordance with the provisions of section 287(a)(1) of the Immigration and Nationality Act. We reject the contention that, under such circumstances, the alien may refuse to identify himself in the prescribed way, claiming the privilege against self-incrimination. The pertinent provisions of the Fifth Amendment do not protect the alien in such a situation; for alien registration statutes are "essentially non-criminal and regulatory provisions." *U.S.* v. *Sacco*, 428 F.2d 264 (C.A. 9, 1970), cert. denied 400 U.S. 903. We specifically reject the immigration judge's attempted extension of the principles stated in *Miranda* v. *Arizona*, 384 U.S. 436 (1966). That case did not relate to a legitimate request for identification which a Service officer may direct to an alien in a non-criminal matter but dealt "with the admissibility of statements obtained from an individual who is subjected to custodial police interrogation."

We believe that the conclusion which we have reached is consistent with the views which the Court of Appeals for the Seventh Circuit expressed in its decision in *United States* v. *Campos-Serrano*, 430 F.2d 173 (1970), a decision which was subsequently reversed, on grounds not relevant here, by the Supreme Court in 404 U.S. 293 (1972). That was a criminal case. The defendant, Campos-Serrano, had been indicted under the provisions of 18 U.S.C. section 1546 for possession of a forged alien registration receipt card. At the trial it was shown that, after a completed examination of an alien registration receipt card exhibited by the defendant, immigration officers had come to the defendant's apartment a second time, and that they had made that second visit for the purpose of ascertaining whether the card had been forged. While the Circuit Court thought "that the defendant should have been given Miranda warnings before he

was asked to produce his alien registration receipt card a *second time*" [emphasis supplied], it determined that, "the initial inquiry to determine whether the defendant was properly in this country did not violate his fifth amendment privilege;" for, "Since the purpose of these cards is noncriminal, the fifth amendment should not prevent production in the normal immigration inquiry."

The immigration judge, who had come to the erroneous conclusion that the respodent's rights under the Fifth Amendment had been violated, was of the opinion that the so-called "fruit of the poisoned tree" doctrine fitted the facts of this case, and that consequently the documents offered by the Service were not admissible in evidence. It was his opinion that "it necessarily follows that the Service has here failed to establish deportability and that the proceedings should and must be terminated." We disagree with his interpretation of that well-established doctrine. In the case before him, and now before us, the Service obtained from the respondent no information that was not already in its possession. The fact that he had handed his copy of the crewman's landing permit (Exhibit 3) to a Service officer merely made it easier for the Service to locate the identical copy of that permit (see Exhibit 2) which the Service had retained at the time when the respondent had received his copy. The respondent's Hong Kong Seaman's Identity Book No. 46161 (see Exhibit 5) had been turned over to the Service by the Master of the "Eastern Sakura" and had been in the Service's possession at least since June 5, 1969, (see Exhibit 8, which is a report of investigation dated June 5, 1969). So had the crew list of the "Eastern Sakura" (Exhibit 4), and the Master's letter of May 2, 1969, in which he reported the respondent's desertion to the Service (Exhibit 6). Inasmuch as all the evidence on which the Service sought to rely was in its possession long before the respondent's apprehension, the immigration judge erred in his determination that that evidence was the "fruit" of the respondent's copy of his crewman's landing permit.

We conclude that, even if the respondent's copy of his crewman's landing permit had been obtained by the Service in violation of his constitutional rights—and we hold that they were not so obtained—the other documents presented by the Service would have remained untainted, and were admissible in evidence.

We find and determine that the documents submitted by the Service establish clearly, convincingly, and unequivocally that the respondent is an alien, that he is a native and national of China, that he was admitted to the United States as a crewman, that he deserted his ship, that he has remained in the United States

longer than permitted, and that he is deportable as charged in the order to show cause.

The respondent who was represented by experienced immigration counsel deliberately did not apply for a grant of the privilege of voluntary departure. He failed to designate a country of deportation. He made no application for withholding of deportation under section 243(h) of the Immigration and Nationality Act.

ORDER: The appeal is sustained, and the order of the immigration judge of April 5, 1971, is withdrawn.

Further order: the respondent shall be deported from the United States to the Republic of China on Taiwan on the charge contained in the order to show cause.

Further order: If the aforementioned country declines to accept the respondent into its territory or fails to advise the Attorney General within three months following original inquiry whether it will or will not accept the respondent into its territory, the respondent shall be deported to Hong Kong.

**Maurice A. Roberts, Chairman, Concurring:**

While I agree that the Service appeal must be sustained, I arrive at the conclusion by a somewhat different route from that of the majority opinion. In addition, I wish to dissociate myself from some of the precepts laid down by the majority which I consider not only unnecessary for the conclusion reached but also incorrect as a matter of law.

From the record before the Board, the following facts appear: The respondent is a 28-year-old male alien, a native and citizen of China, who was admitted to the United States at Galveston, Texas on April 4, 1969 as a nonimmigrant crewman from the British motor vessel "Eastern Sakura." He was granted shore leave for the period of time the vessel was to remain in port, in no event to exceed 29 days. As evidence of his conditional landing privilege and alien registration, he was given a Form I—95A by the immigrant inspector (Ex. 3). A duplicate Form I—95B was retained by the Immigration and Naturalization Service (Ex. 2). He did not depart with the vessel when it left port on April 30, 1969 and he was reported by the master as a deserting crewman on the vessel's outbound crew list (Ex. 4). The master turned over to the Service the respondent's Hong Kong Seaman's Identity Book (Ex. 5), which he had left behind on the vessel. These documents were

retained in a file relating to the respondent maintained in the Service's office at Houston, Texas.

On June 5, 1969, four investigators from the Newark, New Jersey office of the Immigration and Naturalization Service conducted an investigation at the Clairmont Diner in Verona, New Jersey, to see if aliens unlawfully in the United States were employed there. This was a periodic visit to the restaurant, occasioned by the fact that on a number of prior visits numerous Greek and Chinese aliens had been found working there illegally as kitchen help. Two of the investigators remained outside while two entered the premises. Five minutes later, the respondent was seen running out of the restaurant's rear door, wearing the white jacket typical of waiters, bus boys and kitchen help, which he tried to shed as he ran. One of the investigators pursued and caught him, placed him in handcuffs, and put him in the rear of a nearby Service automobile. The other investigators soon returned with other aliens found working illegally in the restaurant.

The investigators took the aliens, including the respondent, from the car after about 15 minutes and went with them to a house where the aliens all resided, about 100 yards away. There the handcuffs were removed. One of the investigators asked the respondent, through one of the other aliens acting as interpreter, if he had a ship's pass. The respondent indicated that he did and that it was upstairs in his room. The respondent led the investigator upstairs to his room, found his Form I—95A among his possessions, and handed it to the investigator. The respondent's identity, ascertained from his surrendered Form I—95A, was relayed by telephone to the Service's Newark office, which then learned by telephone from the Service's Central Office in Washington, D.C. that the Houston office had a file on the respondent as a deserting crewman. That file was subsequently obtained. The respondent, meanwhile, was brought to the Newark office, where he executed a signature specimen form (Ex. 9). On the same day, an Order to Show Cause in deportation proceedings was issued. It is conceded that at no time was the respondent given the warning formulated in *Miranda* v. *Arizona*, 394 U.S. 436 (1966).

At the hearing before the immigration judge, counsel for the respondent admitted that the respondent had been served with an order to show cause but refused to concede anything else, either by way of his identity or the correctness of the charges. On advice of counsel, respondent refused to answer any question or to identify any documents. Service investigators testified as to the manner of the respondent's apprehension and identification on

June 5, 1969 and identified the various exhibits sought to be introduced, including those contained in the Houston file. The Service's trial attorney offered in evidence, over counsel's objection, the various documents showing respondent's identity, admission as an alien crewman, and desertion (Exs. 2, 3, 4, 5 and 6). The immigration judge concluded that the respondent's arrest without a warrant was proper, but that the Service had obtained his Form I—95A unlawfully because he had not been given the *Miranda* warning before he was asked to produce it. Since the Service had ascertained respondent's identity through the (to the immigration judge) illegally obtained Form I—95A and since the other documentary evidence, though already in the Service's files, had been located only through his (to the immigration judge) illegally obtained identification, the immigration judge concluded that the latter documents were equally inadmissible as the "fruit of the poisonous tree." He sustained counsel's objection to the admission of all the documents and ordered the proceedings terminated for lack of proof of the charges. The Service has appealed.

The interplay of several distinct, but related, legal principles must be considered in appraising the admissibility of the evidence: (1) Any witness, including an alien, may invoke the Fifth Amendment's privilege against self-incrimination, *Sherman* v. *Hamilton*, 295 F.2d 516 (C.A. 1, 1961), cert. denied 369 U.S. 820. (2) A person who is in custody or in a custodial setting must be given the *Miranda* warning before any statement he makes can later be received in evidence in proceedings against him, *Miranda* v. *Arizona*, 384 U.S. 436 (1966). (3) Evidence illegally obtained by Government agents may not be used against the person whose rights were thus violated, *U.S. ex rel. Bilokumsky* v. *Tod*, 263 U.S. 149 (1923); *Valeros* v. *INS*, 387 F.2d 921 (C.A. 7, 1967). (4) Where Government agents obtain evidence thus illegally, not only is the use of the evidence itself forbidden, but also use of information or evidence deriving from the evidence thus illegally obtained, since they constitute "the fruit of the poisonous tree," *Nardone* v. *United States*, 308 U.S. 338 (1939); *Wong Sun* v. *United States*, 371 U.S. 471 (1963). (5) The alien registration requirements are essentially non-criminal and regulatory provisions. They therefore present no Fifth Amendment problem, *United States* v. *Sacco*, 428 F.2d 264 (C.A. 9, 1970), cert. denied 400 U.S. 903, and the *Miranda* warning is not a prerequisite to a request by a Service officer for production of an alien registration receipt card, *United States* v. *Campos-Serrano*, 430 F.2d 173 (C.A. 7, 1970), affirmed on another ground, 404 U.S. 293 (1971).

Turning now to the facts developed of record, I agree with the majority opinion and with the immigration judge that the respondent was properly stopped and lawfully detained by the investigator. The respondent, oriental in appearance, was fleeing from the rear door of a restaurant which had previously on numerous occasions employed aliens here illegally as kitchen help. He wore the uniform customarily worn by kitchen help and he was trying to discard it. His sudden departure was obviously precipitated by the entrance on the premises of the other Service investigators. He could speak no English. On these facts, the investigator had reason to believe that the respondent was an alien in the United States in violation of the immigration laws who was likely to escape before a warrant could be obtained for his arrest. Under these circumstances, respondent's initial detention for questioning, followed by his arrest without a warrant, was fully justified under section 287(a)(1) and (2) of the Immigration and Nationality Act, *Au Yi Lau v. INS*, 445 F.2d 217 (D.C. Cir. 1971), cert. denied 404 U.S. 864; *Cheung Tin Wong v. US INS*, 468 F.2d 1123 (D.C. Cir. 1972); *Shu Fuk Cheung v. INS*, 476 F.2d 1180 (C.A. 8, 1973); *Hon Keung Kung v. District Director*, 356 F. Supp. 571 (E.D. Mo. 1973). Cf. *United States v. Mallides*, 473 F.2d 859 (C.A. 9, 1973).

I do not agree with the view of the majority that the respondent, handcuffed and confined in a Service automobile, was merely being temporarily detained for further interrogation and was not the subject of a "full blown" arrest. Nor do I think that he was any the less under restraint when he was taken from the car to his own apartment and the handcuffs were removed. Can it be imagined that, if he had then sought to make a break for freedom under these circumstances, the investigators would have let him go without hindrance on the notion that he was no longer in Service custody?[1] It seems to me that he was lawfully in Service custody when he was taken from the car and continued to be lawfully in Service custody when, on request, he later produced his Form I—95A.

The fact that he was in custody does not, in my view, compel the conclusion that he was entitled to the *Miranda* warning before he could be asked to produce his Form I—95A. As the majority

---

[1] See *Miranda v. Arizona*, 384 U.S. 436 at 444 (1966): "By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."

opinion points out, under the pertinent regulations that form was the evidence of alien registration designed for crewmen. None of his Fifth Amendment rights was violated by compelling him to register in the first place and carry his registration card, *United States* v. *Sacco, supra*. In a non-custodial setting, its production could be required without giving him the *Miranda* warning, *United States* v. *Campos-Serrano, supra*. I think the same rule applies even in a custodial setting. The *Miranda* requirement arose out of the Fifth Amendment's privilege against self-incrimination. Since that privilege does not impair the Government's right to request production of an alien registration card, it seems to me that the right to the *Miranda* warning, derived from the same privilege, is equally inapplicable, regardless of whether the alien is in or out of custody.

Thus, in my view, the Form I—95A produced by the respondent on request was not unlawfully obtained and should have been received in evidence. The information as to the respondent's identity which it revealed was information lawfully obtained, and the other documents already in the Service's files in Houston, which this identifying information led to, were equally lawfully available for evidentiary purposes. They were, in fact, cumulative evidence, for the Form I—95A was itself sufficient to establish the respondent's identity as an alien crewman whose limited admission had already expired. The other documents could not, in any event, be considered "the fruit of the poisonous tree" for there was no "poisonous tree" to begin with. I agree with the majority opinion that respondent's deportability as charged has been sustained by evidence which is clear, convincing and unequivocal. The Service appeal is properly sustained.

That being so, I see no reason for the majority opinion to go further and to lay down additional precepts which are not required to reach this decision and which are, in my estimation, of dubious validity. I refer particularly to the following statements appearing on page nine of the majority opinion:

> ... Inasmuch as all the evidence on which the Service sought to rely was in its possession long before the respondent's apprehension, the immigration judge erred in his determination that that evidence was the 'fruit' of the respondent's copy of his crewman's landing permit.
>
> We conclude that, even if the respondent's copy of his crewman's landing permit had been obtained by the Service in violation of his constitutional rights ... the other documents presented by the Service would have remained untainted, and were admissible in evidence.

The law realistically recognizes that on occasion some overzealous Government officials may overreach and may themselves violate constitutionally protected rights in obtaining evidence of

wrongdoing on the part of others. The rule excluding such evidence (the exclusionary rule) is founded on sound principles of policy laid down long ago. See *Weeks* v. *United States*, 232 U.S. 383 (1914); *Wong Sun* v. *United States, supra*. In *Silverthorne Lumber Co.* v. *United States*, 251 U.S. 385 (1920), the exclusionary rule was extended to bar not only the evidence itself unlawfully obtained, but also evidence derived from information thus illegally received. The Court stated (251 U.S. at 392):

... The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the court, *but that it shall not be used at all*. Of course this does not mean that the *facts* thus obtained become sacred and inaccessible. *If knowledge of them is gained from an independent source they may be proved like any others, but the knowledge gained by the government's own wrong cannot be used by it in the way proposed* ... [Emphasis added].

And see *Nardone* v. *United States*, 308 U.S. 338, 340-341 (1939):

... To forbid the direct use of methods thus characterized but to put no curb on their full indirect use would only invite the very methods deemed 'inconsistent with ethical standards and destructive of personal liberty ...' The burden is, of course, on the accused in the first instance to prove to the trial court's satisfaction that wire tapping was unlawfully employed. Once that is established—as was plainly done here—the trial judge must give opportunity, however closely confined, to the accused to prove that a substantial portion of the case against him was a fruit of the poisonous tree. This leaves ample opportunity to the Government to convince the trial court that its proof had an independent origin.

So far as I am aware, neither the exclusionary rule itself nor its application to "the fruit of the poisonous tree" has thus far been repudiated by the courts. See *Wong Sun* v. *United States*, 371 U.S. 471 (1963); *Gelbard* v. *United States*, 408 U.S. 41 (1972); *United States* v. *Calandra*, 414 U.S. 388 (1974).

The majority opinion declares that otherwise undiscovered documentary evidence already in the files of any of the Service's many far-flung offices at the time of the illegal apprehension complained of cannot be considered "the fruit of the poisonous tree," even though its existence is discovered and it is brought to light only by identifying information unlawfully obtained in violation of the alien's constitutional rights. I cannot agree. Such a holding would effectively undermine the exclusionary rule and its corrollary. Under it, identifying information, however unlawfully obtained, could be used as a direct lead to a witness or other evidence, otherwise undiscovered, and the witness or documentary evidence thus unearthed could be used at trial.

The cases do not sustain this novel theory. The testimony of witnesses whose identity was discovered through unlawfully obtained information has been discarded, *Tucker* v. *Johnson*, 352

F.Supp. 266 (E.D. Mich. 1972), affirmed without opinion 480 F.2d 927 (6 Cir. 1973); *United States* v. *Mallides*, supra; *United States* v. *Guana-Sanchez*, 484 F.2d 590 (C.A. 7, 1973), cert. petition pending, No. 73-820, solely on the question of standing.

An argument similar to the view of the majority opinion on this point was presented by the Government in *Au Yi Lau* v. *INS*, *supra*. The court's reaction, while not decisive, is illuminating. See 445 F.2d 217 at 224, n. 11 and accompanying text.

Since I agree that the Service's evidence was lawfully obtained without violating the respondent's constitutional rights, I would sustain the Service appeal without discussion of what our decision would be if his constitutional rights had, in fact, been breached.