UNITED STATES of America, Plaintiff,

v.

William CAMMISANO et al., Defendants.

No. 75 CR 52-W-1.

United States District Court,
W. D. Missouri, W. D.

June 2, 1976.

Bert C. Hurn, U. S. Dist. Atty., Philip Adams, Jr., Sp. Atty., Dept. of Justice, Kansas City, Mo., for plaintiff.

Joel Pelofsky, Kansas City, Mo., for D. Cammisano.

James R. Wyrsch, Kansas City, Mo., for D. Miles.

Patrick R. Faltico, Kansas City, Mo., for D. Cuezze.

## MEMORANDUM AND ORDER

### I.

JOHN W. OLIVER, District Judge.

On May 10, 1976, we entered an interlocutory order which directed production of particular documentary evidence for this Court's *in camera* inspection in connection with a pending motion to dismiss based in part upon alleged selective and discriminatory prosecution grounds.[1] The government's response to that order was filed May 21, 1976. That response expressly refused to produce for this Court's *in camera* examination the following documentary evidence:

> 3. All correspondence, inter-department communications, intra-department communications and referral documents

---

1. We attach hereto as Appendix A a copy of our memorandum opinion and orders of May 10, 1976, and, as Appendix B, a copy of our memorandum opinion and orders of March 29, 1976, in order to afford a background for the memorandum opinion and order we enter today.

relating to the particular violations alleged in this prosecution which were made, retained and/or transmitted within the Department of Agriculture, within the Department of Justice and between them, together with all reports attached to such documents, correspondence and communications except as have already been provided defendants with notations as to which items have been so provided.

4. All correspondence, inter-department communications, intra-department communications and referral documents, together with all supporting documents and reports, relating to any violations of Section 601ff, Title 21, U.S.C., which occurred in the Western District of Missouri during the period January, 1972 to and through December, 1974, and which were made, retained and/or transmitted within the Department of Agriculture within the Department of Justice and between them, whether such correspondence, communications and documents resulted in prosecution or not.

5. All correspondence, inter-department communications, intra-department communications and referral documents, together with all supporting documents and reports relating to any violations of Section 601ff, Title 21, U.S.C., which occurred in the United States for the period January, 1972 to and through December, 1974, and which were made, retained and/or transmitted within the Department of Agriculture, within the Department of Justice and between them, whether such correspondence, communications and documents resulted in prosecution or not.[2]

The case now pends on defendants' motion to dismiss based upon the government's refusal to comply with this Court's order of May 10, 1976. We have carefully considered all briefs in support and in opposition to the pending motion, including but not limited to the government's suggestions in opposition filed May 28, 1976. Defend-

ants' motion will be granted for the reasons we shall now state.

## II.

The government bases its refusal to comply with this Court's order on the notion that the defendants have not "borne" the burden imposed by *United States v. Berrios,* 501 F.2d 1207 (2nd Cir. 1974). That notion rests upon the untenable assumption that the government is under duty to comply only with court orders which it believes should be entered. On page 6 of our memorandum opinion of May 10, 1976, we expressly rejected the government's contention in regard to the nature of the question then presented to the Court for its determination. We there stated:

The question presently before this Court is not, as the government suggests, whether defendants have presently established, within the language of *United States v. Berrios,* 501 F.2d 1207, 1211 (2nd Cir. 1974), upon which the government expressly relies, whether "others similarly situated have not generally been proceeded against" and that, under the circumstances, defendants were, in fact, "singled out for prosecution."

Rather, as we concluded in our May 10, 1976 Memorandum Opinion, "the quite narrow question presented by defendants' pending discovery motion is whether defendants have made a sufficiently particularized showing to require this Court to enter an order requiring the government to make further production for this Court's *in camera* inspection."

Jurisdiction and power to answer that question are vested in this Court rather than in the Special Attorneys in charge of the prosecution of this case. The government's reading of *Berrios* does not afford a proper ground for the government's refusal to comply with this Court's order of May 10, 1976. In *Berrios,* the Second Circuit merely indicated that if it had been sitting as the trial court, it would have required some-

2. For purposes of this order only we accept the government's contention that it has in fact presented all relevant material in connection with paragraphs 1, 2, and 6, of defendants' motion for discovery, which was incorporated by reference in the order entered May 10, 1976.

thing more than the affidavit of defendant's counsel to support an order for further discovery.[3] The Second Circuit stated that "Upon the meager preliminary showing made here, we doubt whether we would have granted a hearing or ordered the production of evidence for such a hearing, since Berrios appears frankly to have embarked upon a fishing expedition." The Second Circuit, however, recognized that it was not sitting as a trial court and that, as an appellate court, it was bound by principles stated in *United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). The Second Circuit therefore properly concluded that "Although we might have proceeded differently in this case, we cannot on this record say that Judge Judd abused his discretion in ordering the government to turn over to him for 'study' its memorandum recommending prosecution."

The Court of Appeals in *Berrios* vacated Judge Judd's production order only because it concluded that the trial judge "went too far" when he ordered direct release to the defendants of all portions of the material which he ordered to be produced without first determining whether the data produced would tend to establish the elements of the defendants' defense of selective and discriminatory prosecution.

This Court, of course, has not reached; indeed, it is unable to reach, the question of whether or not the data which we have ordered produced for our *in camera* examination may or may not tend to establish the elements of the defendants' alleged defense of selective and discriminatory prosecution. We have, however, found and concluded from the data presently before the Court that the defendants have made a sufficiently particularized showing to require the government to produce additional data for this Court's *in camera* examination, in order that the question of whether such data may or may not support the defendants' alleged defense of selective and discriminatory prosecution be determined on the basis of fact, rather than conjecture and speculation. We believe that defendants are entitled to no less, as a matter of due process.

■ This Court has been required, as the Seventh Circuit *en banc* was required in *United States v. Falk,* 479 F.2d 616, 617 (7th Cir. 1973), "to focus closely upon the dividing line between presumptive regularity in the enforcement of penal laws and impermissible prosecutorial selectivity." The majority opinion commenced its analysis, with which we agree, by noting that "Certainly, the prospect of government prosecutors being called to the stand by every criminal defendant for cross-examination as to their motives in seeking an indictment is to be avoided." *Falk* immediately noted, however, that "That does not mean that a criminal defendant is never to be afforded an opportunity to prove that the prosecution stems from an improper prosecutorial design or that he may never question a prosecutor under oath." *Falk* also stated, and we agree, that "The presumption is always that a prosecution for violation of a criminal law is undertaken in good faith and in nondiscriminatory fashion for the purpose of fulfilling a duty to bring violators to justice." But *Falk* then stated, and again we agree, that "However, when a defendant alleges intentional purposeful discrimination and presents facts sufficient to raise a reasonable doubt about the prosecutor's purpose, we think a different question is raised." [479 F.2d 620–621]

Under the particular circumstances of this case, and in light of its present procedural posture, we do not yet have the ques-

---

**3.** An affidavit in that case stated only that defense counsel and the defendants believed that facts existed which would indicate, a vindictive motive on the part of the government in selecting the defendants for prosecution and that facts existed showing that there were many persons subject to prosecution who had not been prosecuted under circumstances similar to those for which defendants were indicted.

The Second Circuit pointed out that while a letter from the Department of Justice indicated that there had been only three indictments of others for alleged violations of § 504, Title 28, U.S.C., defendants' counsel's affidavit did not name any unprosecuted violators nor did it identify any of the unions in which possible violators may have held office.

tion before us that the Seventh Circuit had before it in *Falk.* Rather, we have before us the question of whether additional discovery should have been ordered, as it was ordered on May 10, 1976, and whether the government is free to ignore that order because it disagrees with this Court's determination of fact and law under the circumstances.

The defendants have demonstrated to our satisfaction that there are apparently many persons in apparently similar circumstances who have violated the Federal Meat Inspection Act, but who have not been prosecuted. That circumstance, standing alone, may or may not eventually be significant. For the Secretary of Agriculture has statutory authority to merely issue a warning for "minor" violations of the Act and not report such violations for prosecution by the Department of Justice. See 21 U.S.C. § 676(b). The government's refusal to comply with this Court's order of May 10, 1976, leaves us in the dark in regard to whether the Department of Agriculture has promulgated any controlling criteria for determining whether a violation may be classified as "major" or "minor," and in regard to whether such criteria were or were not followed in connection with the reporting of this case for prosecution by the Department of Justice.

Government Exhibits Nos. 19 and 20 raise substantial questions concerning possible irregularities in the manner in which this case was reported by the Department of Agriculture to the Department of Justice for prosecution. Exhibit 19, a cropped version of Exhibit 20 (initially produced only for *in camera* examination), reveals that two copies of the Department of Agriculture's investigation report were sent directly to "U. S. Attorney, Kansas City," apparently before any reference for prosecution was made by the Department of Agriculture to the Department of Justice. Such a

transmittal would appear to be in violation of the Department of Agriculture's own guidelines concerning the processing of violations of the Federal Meat Inspection Act. Department of Agriculture MPI Directive No. 922.6.

■ At the time we entered our May 10, 1976 order for *in camera* production, there were affidavits and some evidence which could be read to tend to support defendant Cammisano's and defendant Cuezze's claims that they were in fact singled out for prosecution because of their Italian ancestry. The evidence thus far adduced in that regard is not by any means conclusive. See and compare *United States v. Mirabile,* 503 F.2d 1065, 1067 (8th Cir. 1974). *Oyler v. Boles,* 368 U.S. 448, 456, 82 S.Ct. 501, 505, 7 L.Ed.2d 446, 453 (1962), teaches that selective, as distinguished from discriminatory, prosecution is not improper unless it is established that the prosecution is "deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification." Prosecution based on a defendant's Italian ancestry would obviously be an impermissible and arbitrary classification.

■ The data before the Court at the time the May 10, 1976 production order was entered, however, included more than the raw statistical data which was considered by Judge Hunter in *Mirabile, supra.* In this case, the Court has, for example, the affidavit of defendant Cuezze filed December 5, 1975, which the government has elected to more or less ignore.

The government has never attempted to deny the portion of defendant Cuezze's affidavit which states that a Special Agent of the FBI had stated to him, "I am going to put you in jail. But you do have an alternative. You can either go to jail or you can go to work for me."[4] The data present in

---

4. Nor has the government denied the following statements in defendant Cuezze's affidavit of December 5, 1975:

Agent Flossie thereupon commented that this then would be a case where the "good" Italians would be against the "bad" Italians.

In further explanation of this comment, Agent Flossie stated that the real name of the U. S. prosecuting attorney was not really Philip J. Adams but instead was "Adamo" or "Adame." Agent Flossie then stated that Affiant was "an Italian" rather than an

the record at the time of our May 10, 1976 order, in our judgment, warranted further *in camera* evidentiary production. Indeed, *in camera* production of some additional relevant evidence might be sufficient to shift the burden of going forward with proof of non-discrimination on the government. See *United States v. Falk, supra,* at 624. Compare *Barker v. Wingo,* 407 U.S. 514, 530, 92 S.Ct. 2182, 2191, 33 L.Ed.2d 101, 116 (1972).[5]

We reiterate our prior findings and conclusions that the factual data before the Court on May 10, 1976 did not establish grounds for granting defendants' earlier motion to dismiss based upon selective and discriminatory prosecution. The factual circumstances stated above, however, when considered in light of the other factual circumstances we have stated in our earlier memoranda opinions which we expressly incorporate by this reference, did, in our judgment, establish more than sufficient grounds for entering our May 10, 1976 order for production for *in camera* examination.

### III.

■ The applicable cases establish that the government's refusal to comply with this Court's order for *in camera* production requires dismissal of the pending indictment. A reference to *Berrios* is again help-

American, but at least Mussolini (in Italy) knew how to handle "the Mafia people" and that the only proper way of handling them was to "line them up against a wall and shoot them."

5. Several commentators have likened the analysis of selective and discriminatory prosecution claims to that used in connection with denial of equal protection allegations. Givelber, *Selective Enforcement of the Criminal Law,* 1973 U.Ill.L.F. 88. Under traditional equal protection analysis, where a classification is historically suspect, such as race, or affects a fundamental right, such as rights under the First Amendment, the government must demonstrate that it furthers a compelling state interest. Any other classification must bear a rational relationship to a legitimate governmental purpose.

Under such an analysis, any discrimination on the basis of national origin would obviously

ful. *Berrios* reflects that Judge Judd based his dismissal of the indictment in that case upon principles stated in *Alderman v. United States,* 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969).

*Alderman's* procedural history is noted in the Supreme Court's final decision on the merits, 394 U.S. at 168, 89 S.Ct. at 963, 22 L.Ed.2d at 183, when it made reference to the earlier *per curiam* opinion in that case, reported at 390 U.S. 136, 88 S.Ct. 752, 19 L.Ed.2d 962 (1968). Mr. Justice White stated in the decision on the merits that in the *per curiam* opinion, 390 U.S. 136, 88 S.Ct. 752, 19 L.Ed.2d 962, "we refused to accept the *ex parte* determination of relevance by the Department of Justice in lieu of adversary proceedings in the District Court." The Supreme Court's order entered in *Alderman,* as reported in 392 U.S. 919, 88 S.Ct. 2257, 20 L.Ed.2d 1381 (1968), reflects that counsel were directed to include among the issues to be discussed in the briefs and oral argument on the merits the question of whether the records of an alleged unlawful electronic surveillance should be "subjected to *in camera* inspection by the trial judge to determine the necessity of compelling the Government to make disclosure of such records to petitioners, and if so to what extent."

The decision of *Alderman* on the merits, 394 U.S. at 176, 89 S.Ct. at 968, 22 L.Ed.2d

require application of the compelling state interest test. Discrimination on other bases, which do not involve suspect classes or federally protected constitutional rights, would require a determination of whether the standard for selection is rationally related to the purposes of the criminal law under which the defendant is being prosecuted.

There is some suggestion in this case that defendants have been selected for prosecution on the basis of some alleged association with "organized crime." While it has been held that such a standard for selection is rationally related to the purpose of enforcement of the alien registration laws, *United States v. Sacco,* 428 F.2d 264, 271 (9th Cir. 1970), not all classifications used by the government may be found rationally related to the purpose of the particular criminal law being invoked. See Chief Judge Becker's opinion in *United States v. Robinson,* 311 F.Supp. 1063 (W.D.Mo.1969).

at 188, reflects that Solicitor General Griswold conceded and agreed that "for purposes of a hearing to determine whether the Government's evidence is tainted by illegal surveillance, the transcripts or recordings of the overheard conversations . . . must be duly and properly examined in the District Court." That concession was based on the common sense recognition that a District Court simply cannot make an intelligent ruling unless it has the factual data before it for its *in camera* examination. We had this thought in mind when we stated the following in our May 10, 1976 opinion:

> Should this Court refuse to grant the pending motion, it would be required to base its determination of the ultimate question of whether the defendants involved in this case were in fact singled out for prosecution on guesswork and speculation. We refuse to base judicial decision on such a ground, particularly in a case where it is obvious that if the regulations and directives of two departments of the government were complied with, a full and complete administrative record is available for this Court's *in camera* review.

▮ The government's discussion of Rule 16 of the Rules of Criminal Procedure in its filing of May 28, 1976 and in other briefs presented during the course of this case fails to recognize that the power and jurisdiction vested in a District Court of the United States in regard to discovery in a criminal case is not limited or exclusively defined by either the Rules of Criminal Procedure or by procedural statutes, such as the Jencks Act, Section 3500, Title 18, United States Code. Indeed, the government's argument completely ignores the constitutional considerations in regard to discovery in a criminal case mandated by *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny.

*Goldberg v. United States,* —— U.S. ——, 96 S.Ct. 1338, 47 L.Ed.2d 603 decided March 30, 1976, but not yet reported, 44 U.S.L.W. 4424, is the most recent case which illustrates that separate questions are presented in regard to whether particular data which may not be discoverable under, for example, the Jencks Act, may nevertheless be discoverable under the doctrine of *Brady v. Maryland.*[6]

The discovery ordered in this case, although consistent with power and jurisdiction conferred by the Rules of Criminal Procedure, rests upon "The fundamental demands of due process of law in the fair administration of criminal justice", to which Chief Justice Burger made reference in *United States v. Nixon,* 418 U.S. 683, 713, 94 S.Ct. 3090, 3110, 41 L.Ed.2d 1039, 1066 (1974). The validity of an order for *in camera* examination was affirmed in that case.

**6.** Footnotes 3 and 15 of *Goldberg v. United States* make clear the separate nature of the questions discussed in the text. Footnote 3 stated:

> The Court granted the petition "limited to Question 8 presented by the petition," 422 U.S. 1006, 95 S.Ct. 2627, 45 L.Ed.2d 669, which reads as follows:
>
> Whether 18 U.S.C. § 3500, the Jencks Act, contains an "attorney's work product exception"; and whether a Government attorney's notes of conversations with the key Government witness, to whom the prosecutors read back their notes from time to time, where the witness corrected same, which notes were prepared "only after lengthy conversations had occurred and a mutual understanding of the factual situation" had been reached, if not compellable under the Jencks Act, are compellable under the doctrine of *Brady v.*

*Maryland* [373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)]. *Ibid.*
In light of our result, we need not address the *Brady* claim. See n. 15, *infra.*
Footnote 15 stated:
Pending the result of the proceedings on remand, we decline to examine the 237 pages of materials. That is initially a task for the District Judge. For that reason any disposition of the *Brady* issue raised by petitioner, see n. 3, *supra,* must be deferred pending the District Court's inquiry on remand.
*Goldberg,* incidentally, explodes the notion held by some government counsel that the Jencks Act was enacted by the Congress for the purpose of somehow limiting the scope of the Supreme Court's decision in *Jencks v. United States,* 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957). See —— U.S. ——, 96 S.Ct. at 1344, 47 L.Ed.2d at 613, 44 U.S.L.W. at 4427.

*United States v. Nixon* made clear that even a presumptively valid claim of Presidential privilege must be considered in light of our historic commitment to the rule of law administered in accordance with an adversary system of criminal justice. That case concluded that:

> The need to develop all relevant facts in the adversary system is both fundamental and comprehensive. The ends of criminal justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts. The very integrity of the judicial system and public confidence in the system depend on full disclosure of all the facts, within the framework of the rules of evidence. To ensure that justice is done, it is imperative to the function of courts that compulsory process be available for the production of evidence needed either by the prosecution or by the defense. [*Id.* at 709, 94 S.Ct. at 3108, 41 L.Ed.2d at 1064]

*United States v. Nixon* applied and reiterated long established principles when it concluded that "the right to the production of all evidence at a criminal trial . . . has constitutional dimensions." [*Id.* at 711, 94 S.Ct. at 3109, 41 L.Ed.2d at 1066], and that "the allowance of the privilege to withhold evidence that is demonstrably relevant in a criminal trial would cut deeply into the guarantee of due process of law and gravely impair the basic function of the courts." [*Id.* at 712, 94 S.Ct. at 3110, 41 L.Ed.2d at 1066]

█ The fair administration of criminal justice, of course, requires that a high degree of deference be accorded to the presumptively proper exercise of prosecutorial discretion in the court's review of material ordered produced for its *in camera* examination. As stated in *United States v. Nixon,* "It is elementary that *in camera* inspection of evidence is always a procedure calling for scrupulous protection against any release or publication of material not found by the court, at that stage, probably admissible in evidence and relevant to the issues of the trial for which it is sought." [*Id.* at 714, 94 S.Ct. at 3110, 41 L.Ed.2d at 1067]

But to say that, is not to say that a Special Attorney has been somehow vested with power and jurisdiction to refuse to comply with an order for *in camera* examination simply because he does not agree with the District Court's findings of fact and conclusions of law.

## IV.

We add a word in regard only to the more glaring inaccuracies in the government's response filed May 21, 1976. The government has suggested that this Court apparently overlooked the contents of government's Exhibit No. 20 which had been voluntarily presented to the Court for its *in camera* examination. The Court did not discuss Exhibit No. 20 in detail in its earlier memorandum opinion because it had been presented *in camera.* We did, however, discuss Exhibit No. 19, which was a cropped version of Exhibit No. 20.

Until the government filed its May 21, 1976 response, to which it attached Exhibit No. 20 for public view, the defendants were not advised that the investigation report of the Office of the Inspector General of the Department of Agriculture had been forwarded to any persons other than the "U. S. Attorney, Kansas City." Defendants were only furnished with cropped Exhibit No. 19. Until we examined Exhibit No. 20, we assumed, as the defendants could have reasonably assumed, that the "U. S. Attorney, Kansas City" was the only person to whom the investigation report had been sent. Now that the government has voluntarily made public the full cover sheet of the Department of Agriculture investigation report by attaching Exhibit No. 20 to its May 21, 1976 response, it is now apparent that the investigation report was being forwarded in apparent accordance with Department of Agriculture regulations except that, for some as yet unexplained reason, the "U. S. Attorney, Kansas City" was also being furnished a premature copy of the report long before there could have been any reference of the Department of Agri-

culture's investigation to the United States Department of Justice.

The mystery of why two copies of an apparently routine Department of Agriculture investigation were forwarded to the "U. S. Attorney, Kansas City" long before consideration by the Office of the General Counsel of the Department of Agriculture, and apparently before any consideration by the Department of Justice in Washington, is, as we have stated, but one of the circumstances which supports the Court's finding of particularized need for further *in camera* examination of the government's files in connection with the authorization of the prosecution of this case and in connection with the standards applied in connection with the other rare criminal prosecutions for alleged violations of the Federal Meat Inspection Act.

The government has also erroneously suggested in its May 28, 1976 response that this Court apparently overlooked Exhibit No. 5 introduced at the evidentiary hearing. That exhibit was nothing more than a vague conclusory affidavit of Glenn G. Birman, Associate Administrator, Packers and Stockyards Administration, U. S. Department of Agriculture, who was not called as a witness at the hearing. Discussion of that exhibit was unnecessary not because the affidavit is "self-explanatory," as asserted by the government, but because it is completely conclusory in nature and void of specific factual information in regard to this particular case. If, in fact, the investigation file in connection with this case was forwarded to the Department of Justice for prosecution, consistent with the established procedures and express regulations of the Department of Agriculture, all that would have been necessary to establish the truth of the conclusion stated in the affidavit would have been to attach a copy of the Department of Agriculture's letter of transmittal to the Department of Justice and to assure this Court that such letter had in fact been sent. Certainly the affidavit of Mr. Birman did not even purport to answer the question of whether the procedures followed in this case were followed in connection with the dozen or so criminal cases prosecuted throughout the United States during each year of the 1970's.

If the same procedures were in fact followed in all criminal prosecutions, including but not limited to the defendants involved in this case, one factual situation would be presented. If not, dependent upon the circumstances, a different factual situation might be presented in regard to defendants' alleged selective and discriminatory prosecution defense. Our order of May 10, 1976 was designed to obtain accurate information in regard to this relevant question of fact.

### V.

The files and records in this case show that we have afforded the government more than an ample opportunity to consider the grounds upon which our order of May 10, 1976 is based and to consider the consequences of permitting the government's Special Attorneys to refuse to comply with an order of this District Court of the United States. Under the circumstances, we have concluded that the relief prayed for in the defendants' pending motion should be granted without further delay.

Accordingly, it is

ORDERED that the indictment in this case should be and the same is dismissed as to all defendants named therein.

### APPENDIX A

### MEMORANDUM AND ORDERS

### I.

On March 29, 1976, we entered orders which denied all then pending motions except (a) defendants' joint motion to suppress evidence, (b) defendants' joint motion for discovery relating to selective prosecution; and (c) defendants' motion to dismiss for prejudicial pretrial delay. Each of those motions was set for plenary evidentiary hearing, which was held April 13, 1976. Additional factual data has been presented to the Court, including some *in camera*, in filings made by both sides subsequent to the hearing.

We have again reviewed each of the above motions in light of all the evidentiary data before the Court and find and conclude that defendants' joint motion to suppress evidence and defendants' motion for prejudicial pretrial delay should be denied. We also find and conclude, for reasons we shall state in some detail that defendants' joint motion for discovery relating to selective prosecution should be granted and that an appropriate order should be entered directing that the government produce for this Court's *in camera* inspection all of the items requested in each of the six paragraphs of defendants' joint motion for discovery.

II.

In part IV of our memorandum opinion of March 29, 1976, we concluded that both defendants' joint motions for discovery relating to selective prosecution and their motion to dismiss for prejudicial pretrial delay presented substantial questions of law. We also stated that we had been required to state the principles of law which would be applied to the factual circumstances of this case when such factual circumstances were eventually developed because the government had not yet indicated a willingness to provide particular factual data for this Court's *in camera* examination which might set such questions at rest without the necessity of further discovery proceedings. We directed attention in that memorandum opinion to the statement of the Ninth Circuit in *United States v. Steele*, 461 F.2d 1148, in which, in directing dismissal, the Court noted that the trial court had been "hampered by the government's refusal to supply data on the number of like offenses."

In this case the government has repeatedly refused our invitation that it make voluntary production for our *in camera* inspection of material and obviously available data which conceivably could set the questions presented by defendants' discovery motions to rest. Rather, the government has, as in *Steele*, hampered this Court's effort to obtain an *in camera* inspection of

factual data which would likely disclose whether or not there is any factual support, and therefore merit, in defendants' joint motion to dismiss on the ground of selective prosecution.

Rather than presenting for our *in camera* inspection the data which might show full and fair compliance with MPI Directive 922.6, as was implicitly invited in part V of our memorandum opinion of March 29, 1976, the government filed four post-evidentiary hearing exhibits (one of which was filed *in camera*) and the affidavits of four persons who were not, for reasons neither apparent nor explained, called as witnesses at the evidentiary hearing. Exhibits No. 13 and No. 14 are no more than copies of 9 C.F.R. § 310, et seq., and 9 C.F.R. § 318, et seq. Discussion of those exhibits is unnecessary.

Exhibit No. 19 is a partially excised copy of the Department of Agriculture investigative report "which was forwarded to the office of the United States Attorney for the Western District of Missouri." Exhibit No. 20 is simply the portions of that report which, for reasons neither explained nor apparent, the government has thus far refused to permit inspection by defense counsel.

Those exhibits, and the four affidavits submitted after the hearing, raise more questions than they answer. Exhibit No. 19, for example, which the government concedes has already been shown defendants' counsel, shows on its face that the Office of the Inspector General for the Department of Agriculture made a direct referral of its investigative report to the "U. S. Attorney, Kansas City." MPI Directive 922.6 and the portion of the 1974 Report of the Secretary of Agriculture attached to our memorandum opinion of March 29, 1976, raise the preliminary question of whether the Department of Agriculture's Office of Investigation ever made an appropriate reference to Agriculture's General Counsel, and whether Agriculture's General Counsel ever made an appropriate reference to the Department of Justice. Furthermore, we do not know whether the Department of Jus-

tice ever made an appropriate reference to the United States Attorney for the Western District of Missouri. We do not know how or why or at whose direction the "U. S. Attorney, Kansas City," was designated "to immediately receive two copies of Exhibit No. 19." We do not know whether the ten other cases actually prosecuted by the Department of Justice throughout the United States during the year 1973 were handled in the same manner in districts other than the Western District of Missouri.

The affidavits of the two F.B.I. agents who were not called as witnesses at the hearing raise additional questions. Special Agent Flosi stated, on the one hand, that "Special Agent Raynor and myself [sic] had not intention of meeting with Cuezze that date [December 2, 1975] for the purpose of attempting to illicit [sic] his cooperation as an F.B.I. informant."

One of Special Agent Raynor's two affidavits, however, states on the other hand, that Special Agent Flosi, after reminding Cuezze that he was "presently awaiting trial on a federal indictment" requested Cuezze "to furnish his cooperation to the F.B.I. in connection with illegal activities being investigated by the F.B.I." Both Special Agents stated in their affidavits that neither were assigned the investigation in this case. The questions of why and at whose direction, if any, Special Agents of the F.B.I. would seek "cooperation" from a defendant awaiting trial in this Court in a case in which the Special Agents of the F.B.I. had no connection are among the questions which might have been developed on cross-examination at the hearing. The fact those agents were not called as witnesses to respond to the affidavits which were then on file, to which we made reference in our memorandum opinion of March 29, 1976, is a circumstance which must be given appropriate weight in our consideration of the pending discovery motion.

On May 4, 1976, defendants responded to the government's broad and generalized assertion of "prosecutorial discretion" as reiterated in the government's post hearing briefs. See our discussion of that position in *Steele* which we quoted and discussed on pages 6 and 7 of our memorandum opinion of March 29, 1976. One of defendant's briefs attached a letter from the Department of Agriculture's Freedom of Information Coordinator along with enclosed copies of the Detention Log of the Department of Agriculture for the year 1973. That data, which includes figures on the Federal Meat Inspection Act, shows on its face that, contrary to the implications of the government's arguments in this case, there were many cases involving a failure to have meat federally inspected which did not result in criminal prosecutions. The Coordinator's letter confirms that the prosecution authorized in this case was one of only a handful of prosecutions in 1973 in spite of the fact that 767 cases were "reported," whatever that may mean, during that year.

James McCafferty's letter attached to our memorandum opinion of March 29, 1976, and the response of the Freedom of Information Coordinator of the Department of Agriculture suggest that the Department of Agriculture has a great deal of available information concerning its administration of the Federal Meat Inspection Act and, more important, that, in sharp contrast with the Department of Justice, it has no hesitancy in making that information available upon request. The question presently before this Court is not, as the government suggests, whether defendants have presently established, within the language of *United States v. Berrios*, 501 F.2d 1207, 1211 (2nd Cir. 1974), upon which the government expressly relies, whether "others similarly situated have not generally been proceeded against" and that, under the circumstances, defendants were, in fact, "singled out for prosecution."

The quite narrow question presented by defendants' pending discovery motion is whether defendants have made a sufficiently particularized showing to require this Court to enter an order requiring the government to make further production for this Court's *in camera* inspection. Should this Court refuse to grant the pending mo-

tion, it would be required to base its determination of the ultimate question of whether the defendants involved in this case were in fact singled out for prosecution on guesswork and speculation. We refuse to base judicial decision on such a ground, particularly in a case where it is obvious that if the regulations and directives of two departments of the government were complied with, a full and complete administrative record is available for this Court's *in camera* review.

Under the authorities cited in our memorandum opinion of March 29, 1976, which we expressly incorporate herein by this reference, and for the reasons stated above, we find and conclude that defendants' joint motion for discovery relating to selective prosecution should be granted. Accordingly, it is

ORDERED (1) that defendants' joint motion to suppress evidence should be and the same is hereby denied. It is further

ORDERED (2) that defendants' joint motion to dismiss for prejudicial pretrial delay should be and the same is hereby denied. It is further

ORDERED (3) that defendants' joint motion for discovery relating to selective prosecution should be and the same is hereby granted. It is further

ORDERED (4) that the government, on or before May 21, 1976, shall produce for this Court's *in camera* inspection all items and data set forth in each of the six numbered paragraphs of defendants' motion for discovery.

### APPENDIX B
### Memorandum and Orders

#### I.

The transcript of the proceedings held December 10, 1975 in this case shows that proceedings were directed to get a mass of motions filed and then pending in this case under control. Page 24 of those proceedings reflects that the Court directed that the defendants file new motions which would consolidate all questions previously raised on an established time schedule. Directions were also made in connection with various motions filed on December 5, 1975.

New motions, which were to be designed to incorporate all questions raised in the mass of earlier motions, together with suggestions in support and opposition to those new motions, have been filed and have been carefully considered by the Court. A number of those motions can and will be ruled at this time. In connection with other motions, however, the parties have requested further discovery and evidentiary hearings. Directions will be made in connection with those motions in order that they may be ruled before trial.

#### II.

It is the Court's understanding that all parties agree that all evidence which any party wishes to be before the Court is in fact before the Court in connection with the following pending motions and that no party wishes to adduce any additional evidence in connection with the following motions:

1. Joint motion of all defendants to dismiss based upon abuse of grand jury process, filed December 31, 1975.

2. Joint motion to dismiss indictment because of invalidity and unconstitutionality of administrative regulations as applied to defendants, filed December 31, 1975.

3. Joint motion to dismiss indictment because of illegal actions of Secretary of Agriculture in "designating" the State of Missouri, filed December 31, 1975.

Having carefully considered each of those motions in light of the suggestions in support and opposition, we find and conclude that all motions should and will be denied.

#### III.

On December 31, 1975 defendants filed:

4. Joint motion to suppress evidence on behalf of all defendants.

That motion seeks to suppress a check given by WHB by defendant Miles, and all photographs, records, visual observations, samples, and inspections of any of the beef, and records purportedly found, observed, or

taken from or in any way handled or observed at Jan's Meat Market. Defendants request an evidentiary hearing with respect to such motion.

Page 27 of the proceedings on December 10, 1975 shows that counsel at that time indicated that all relevant factual circumstances in connection with the motion to suppress the check could be stipulated and that such a stipulation could and would be agreed upon. Indeed, the Court has since approved three stipulations agreed to by defendant Miles and his counsel and the government. One of those stipulations expressly recites that "the factual circumstances agreed to, together with other data which has been the subject of other stipulations, consists of all relevant factual material necessary to decide the motion to suppress to be filed by John Sherman Miles, defendant herein."

In light of defendants' joint assertion that an evidentiary hearing is still necessary, an apparent change of position, an order will be entered setting the motion for hearing to be conducted in accordance with Rule 41(e) of the Federal Rules of Criminal Procedure.

### IV.

On December 30, 1975, all defendants joined in filing what was captioned "Joint motions for discovery, suppression, severance and dismissal," in which was included two separate motions entitled:

5. Motion for discovery relating to selective prosecution; and

6. Motion to dismiss for prejudicial pretrial delay.

Both motions are cognizable under Rule 12(b) of the Federal Rules of Criminal Procedure. The motion for discovery seeks data set forth in six separately numbered paragraphs on pages 1 and 2 of that motion.

The recently filed discovery motion is apparently in support of defendant Cuezze's motion to dismiss filed December 5, 1975. The latter motion is, in turn, supported by an affidavit of defendant Cuezze and by an affidavit of Mr. Faltico, counsel for defendant Cuezze. The recently filed discovery motion is also related to defendant Cammisano's motion to dismiss, filed December 8, 1975, which is supported by an affidavit of Thomas R. Bellmann, an affidavit by Claudia A. Cox and by statements given by Dr. Shimp and Dr. Horn to Special Agent Waage of the Office of the Inspector General of the Department of Agriculture.

Because the motions discussed in this part of this memorandum opinion present substantial questions of law and because the government has not yet indicated a willingness to provide particular factual data for this Court's *in camera* examination which might set such questions at rest without the necessity of further discovery proceedings, we shall state the principles of law which we believe are applicable to the circumstances of this case as they may eventually be developed.

The standards applicable to discriminatory prosecutions were first stated in *Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). The balancing considerations stated in *Oyler v. Boles, Warden*, 368 U.S. 448, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962) have long been well established. Cases requiring application of the principles stated in those cases and their progeny have arisen with any degree of frequency only in the current decade. We need to discuss only cases decided by our controlling Court of Appeals and the cases from other Circuits which have been cited and relied upon by the Eighth Circuit cases. *United States v. Alarik*, (8th Cir. 1971) 439 F.2d 1349, stated the general rule when it said that "the law is clear that a prosecutor may exercise discretion in deciding who should be prosecuted as long as he does not deliberately discriminate between persons in similar circumstances based upon an unjustifiable standard such as race, religion or other arbitrary classification." *Alarik* relied upon the two Supreme Court cases just cited, together with *United States v. Sacco*, 428 F.2d 264 (9th Cir. 1970), and found that under the facts of the Selective Service case there involved that there was no violation of the applicable standard.

*United States v. Wiley,* 503 F.2d 106 (8th Cir. 1974), followed *Alarik* and affirmed the district court's denial of a motion to dismiss the indictment on the alleged ground that the government was "intentionally and purposefully prosecuting self-employed persons, particularly professionals, and specifically attorneys," for the reason that under the circumstances of that case the defendant's proof in support of his motion "failed to convince the trial judge."

*United States v. Mirabile,* (8th Cir. 1974) 503 F.2d 1065, affirmed the trial court's denial of a motion to dismiss based on an alleged selective and discriminatory prosecution ground. That case concluded that Judge Hunter had not abused his discretion in regard to the manner in which he conducted the evidentiary hearing in connection with that motion. On the question of the trial court's discretion, the Eighth Circuit relied upon *United States v. Berrigan,* 482 F.2d 171, 179–182 (3rd Cir. 1973), and compared that case with *United States v. Falk,* 479 F.2d 616, 619–624 (7th Cir. 1973). The Court of Appeals' examination of the hearing record in *Mirabile* satisfied it that "the trial court was warranted in holding that there was insufficient evidence to support a finding of selective and discriminatory prosecution."

*Berrigan,* under the factual circumstances there presented, reached a like conclusion. The Seventh Circuit in *Falk,* however, reversed a Selective Service conviction and, in light of the circumstances of that case, remanded the case in order to permit the defendant to question the Assistant United States Attorney in regard to statements he had made in regard to the reason the defendant was indicted and to present additional evidence "on the issue of other alleged violators and the government's lack of general enforcement." The majority opinion in *Falk* concluded that "the burden of going forward with proof of non-discrimination" shifts to the government, once a defendant has presented a *prima facie* case

of discriminatory prosecution under the factual circumstances of a particular case.

*United States v. Swanson,* 509 F.2d 1205 (8th Cir. 1975), reiterated the principles stated in *Wiley* and *Alarik* and quoted with approval the Second Circuit's opinion in *United States v. Berrios,* 501 F.2d 1207 (2nd Cir. 1974). Particular IRS documents were ordered produced in *Swanson* as the result of the trial court's action granting discovery. Those documents, retained *in camera* in both the trial and appellate court, revealed the existence of "Project ACE," which gave special priorities to the prosecution of tax cases against attorneys, certified public accountants, and enrolled tax practitioners because of the special obligation and responsibility of those professionals to the tax laws. *Swanson* makes clear that Judge McManus' denial of defendant's motion and his refusal to order further discovery or to permit defendant to see the IRS documents produced for *in camera* inspection was proper in light of the particular circumstances of that case. This court cited *Berrios* with approval in two cases before the Eighth Circuit relied upon the rationale of that case in *Swanson.* See *United States v. Barket,* W.D.Mo.1974, 64 F.R.D. 573 and *United States v. Williams,* W.D.Mo.1974, 65 F.R.D. 422. Many of the principles stated in *Barket* and in *Williams* are obviously applicable to the case at bar.

The line of cases just discussed cite with frequent approval the Ninth Circuit's decision in *United States v. Steele,* 461 F.2d 1148 (9th Cir. 1972), which reversed outright a conviction for a violation of the Census statutes. The Ninth Circuit reached that conclusion although both it and the trial court had been "hampered by the government's refusal to supply data on the number of like offenses." The defendant in *Steele,* however, on his own, had located six other persons who had refused to complete census forms but who, unlike the defendant, had not take a public stand against the census. Because none of those persons were recommended for prosecution, the Court of Appeals concluded on the basis of a quite sketchy record that "the authorities

purposefully discriminated against those who chose to exercise their First Amendment rights." The trial court did have the benefit of the Regional Technician of the Census for Hawaii who testified that he had ordered his staff to compile a special background dossier on four persons, a procedure not followed in regard to other offenders.

The court in *Steele* noted that the government had "offered no explanation for its selection of defendants, other than prosecutorial discretion" and that under the particular circumstances of that case, a strong inference of discriminatory prosecution was created and that, accordingly, the "government was required to explain it away, if possible, by showing the selection process actually rested upon some valid ground." The *Steele* case, of course, must be read in light of the most recent Ninth Circuit case, *United States v. Scott*, 521 F.2d 1188 (9th Cir. 1975), which distinguished *Steele* on its facts. *Scott*, as may be true in connection with this case, also presented questions of whether the government improperly interfered with defendant's Fifth and Sixth Amendment right to counsel. Defendant Cuezze's motion to dismiss filed December 5, 1975 which is based upon a general charge of "prosecutorial misconduct of the United States and its agents", when read in light of defendant Cuezze's affidavit and the affidavit of Mr. Faltico, filed in support of that motion, may present similar questions.

The defendant in *Scott* relied upon the familiar cases of *Coplon v. United States*, 89 U.S.App.D.C. 103, 191 F.2d 749 (1951) and *Caldwell v. United States*, 92 U.S.App. D.C. 355, 205 F.2d 879 (1953). We advise counsel that we read the *Coplon* and *Caldwell* line of authority in the same manner that those cases were read in *Hoffa v. United States*, 385 U.S. 293, 307, 87 S.Ct. 408, 416, 17 L.Ed.2d 374, 384 (1966), and as the Eighth Circuit read those cases in *State of South Dakota v. Long*, 465 F.2d 65, 71–72 (8th Cir. 1972). In other words, those cases must be read to hold that a particular defendant must establish that the alleged action of the government or its agent actually, and as a matter of fact, has resulted in prejudice to the defendant under the circumstances of the particular case. Defendant Cuezze, of course, may have additional evidence to offer. If he does not have additional evidence, we advise counsel that we are presently of the view that the data contained in the affidavits filed in support of defendant Cuezze's motion, even when considered to be true, do not support defendant Cuezze's pending motion to dismiss. To say that, however, does not mean that the factual circumstances stated in those affidavits, if true, may not be relevant and material in connection with the joint motion for discovery.

## V.

We have discussed the leading cases in this difficult area of law in the preceding part of this opinion because the government in this case, much like the government in *Falk,* relies generally upon the undisputed proposition of law that "a reasonable prosecutorial discretion is inherent in our judicial system." *Falk* appropriately stated its express "disapproval of the apparently frequent, and often too easy, practice of simply dismissing all allegations of illegal discrimination in the enforcement of criminal laws with a reference to *Oyler v. Boles, supra,* and its statement that the conscious exercise of some selectivity in the enforcement of laws does not violate the Constitution."

In addition to the allegations in the motions involved in this case, and in addition to the factual data presently before this Court by way of stipulation or affidavit, there are readily available public documents which suggest that prosecutions for alleged violations of the Federal Meat Inspection Act are almost as rare as prosecutions for violations of the census laws involved in *Steele*. A call to the Administrative Office of the United States Courts revealed that the cases of prosecutions are so infrequent that they are not separately recorded in that office. As will be presently noted,

James A. McCafferty, Chief of the Statistical Analysis and Reports Branch of the Administrative Office, obtained and forwarded to the Court data regarding 1975 prosecutions under the Federal Meat Inspection Act.

Section 691, Title 21, United States Code, imposed the duty upon the Secretary of Agriculture to make an annual report to the House Committee on Agriculture and to the Senate Committee on Agriculture and Forestry. The most recent report of the Secretary available at the Public Library is the 1974 report. We attach and incorporate by this reference pages 10 and 11 of that report as it relates to Surveillance and Compliance Activities during the years 1970–1974 inclusive. We also attach Mr. McCafferty's letter and its enclosure which relates to prosecutions resulting in convictions for violations of the Federal Meat Inspection Act during fiscal year 1975.

We assume from the scanty information presently before the Court that the Secretary's report must be read in light of the Department of Agriculture MPI Directive No. 922.6, dated February 2, 1973, which was made available to the Court and considered during the proceedings held December 10, 1975. Both the 1974 Report and MPI Directive No. 922.6 make implicit reference to Section 676(b), Title 21, United States Code, which states that nothing in the Federal Meat Inspection Act as amended in 1967 by Public Law 90–201 should be construed as requiring the Secretary of Agriculture to report for prosecution "minor violations of this chapter whenever he believes that the public interest will be adequately served by a suitable written notice of warning." What the Department of Agriculture considers a "major", as distinguished from a "minor", violation is an open question so far as this case is concerned.

The Secretary's 1974 annual report reveals that the Compliance Staff of the Department of Agriculture documented 845 alleged violations of the meat and poultry inspection acts. That figure apparently does not include violations which were closed with letters of warning. For the report shows that 955 letters of warning were issued during the year 1974. Table 7 on page 11 of the report and the information furnished by Mr. McCafferty in regard to the 12 successful prosecutions in 1975 suggests that appropriate inquiry into the question of whether discriminatory prosecution may be involved in this case may involve relatively simple procedures. For it is apparent that only a handful of cases have been referred to the Department of Justice for prosecution since 1970 by the General Counsel of the Department of Agriculture and that the Department of Justice elected to prosecute a still smaller number of those cases referred to it by the Department of Agriculture. It would seem obvious that the problem of determining whether the Guidelines set forth in MPI Directive 922.6 were in fact followed, or whether they were violated in a discriminatory manner, may be determined by an *in camera* inspection of the records and reports made by the Department of Agriculture pursuant to MPI Directive 922.1, issued March 7, 1973, which was also made available to the Court at proceedings held December 10, 1975.

The transcript of the proceedings held December 10, 1975 reflects that counsel for the government would be afforded an appropriate opportunity to discuss the question of voluntary *in camera* production of data which the government believed would lay at rest any charge of selective or discriminatory prosecution which has been presented by the motions filed in this case. An appropriate order will therefore be entered which will require the government to be prepared to state definitively whether it will make voluntary production for this Court's *in camera* inspection of any or all of the items requested in each of the six paragraphs of defendants' joint motion for discovery, filed December 30, 1975, at the evidentiary hearing which must be held in connection with that motion. That order will also provide that the government shall also be prepared to state definitively

whether it will respond to an order of this Court which may be entered, dependent upon the factual circumstances which may be developed at the evidentiary hearing, to produce for this Court's *in camera* inspection any or all items set forth in the six paragraphs of the joint motion for discovery.

### VI.

In regard to the motion for prejudicial pretrial delay, it is not clear whether the defendants wish to adduce additional evidence in connection therewith. The Court is prepared to rule that motion but will not do so until it is definitively advised that both sides have all evidence which any of the parties wish to have before the Court. Appropriate inquiry will be made in that regard at the hearing.

### VII.

We believe that what we have stated above covers all the questions presented in the new motions filed pursuant to the directions made at the close of the proceedings held December 10, 1975. There remain for disposition other motions not included in that group, namely:

7. Defendant Cuezze's motion to quash or modify subpoena duces tecum served on Patrick Faltico;

8. Various motions to intervene filed by applicants for intervention: National Management Systems, Inc., American Employment Services, Inc., Falcon Enterprises, Inc., Falcon Equipment Corporation, K. C. Auto Outlet, Inc., American Meat Processors Association, and Agency Associates, Inc.; and

9. A joint motion by the applicants for intervention to quash subpoenas duces tecum served on Patrick Faltico by the United States.

We have considered this group of motions and all suggestions filed in support and in opposition and conclude that all motions are without merit and should and will be denied.

### VIII.

For the reasons stated, it is

ORDERED (1) that the joint motion of all defendants to dismiss based upon abuse of grand jury process should be and the same is hereby denied. It is further

ORDERED (2) that the motion to dismiss the indictment because of invalidity and unconstitutionality of administrative regulations as applied to defendants should be and the same is hereby denied. It is further

ORDERED (3) that the joint motion to dismiss indictment because of illegal actions of the Secretary of Agriculture in "designating" the State of Missouri should be and the same is hereby denied. It is further

ORDERED (4) that the joint motion to suppress evidence on behalf of all defendants should be and is hereby set for plenary evidentiary hearing, pursuant to Rule 41(e) of the Federal Rules of Criminal Procedure, on Monday, April 5, 1976, at 9:30 A.M. It is further

ORDERED (5) that the joint motion for discovery relating to selective prosecution should be and the same is hereby set for plenary evidentiary hearing, pursuant to Rule 12(b) of the Federal Rules of Criminal Procedure on Monday, April 5, 1976, at 9:30 A.M. It is further

ORDERED (6) that the motion to dismiss for prejudicial pretrial delay is set for plenary evidentiary hearing pursuant to Rule 12(b) of the Federal Rules of Criminal Procedure on Monday, April 5, 1976, at 9:30 A.M. It is further

ORDERED (7) that the motion to quash or modify subpoenas duces tecum served on Patrick Faltico should be and the same is hereby denied. It is further

ORDERED (8) that the various motions to intervene, filed on behalf of various applicants for intervention, should be and the same are hereby denied. It is further

ORDERED (9) that the joint motion of the various applicants for intervention to quash subpoenas duces tecum served on Patrick Faltico by the United States should be and the same is hereby denied. It is further

ORDERED (10) that the government shall be prepared to state definitely at the above-scheduled hearing (a) whether it will make voluntary production for this Court's *in camera* inspection of any or all of the items requested in each of the six paragraphs of defendants' joint motion for discovery and (b) whether such production would or would not be made in the event the Court should order production under the circumstances which may be developed at the hearings above ordered.

The government may, of course, make voluntary production of any data for our *in camera* inspection prior to the hearing should it elect to do so. Such pre-hearing voluntary production would obviously expedite the proceedings in this case.

Table 6--Processed meat and poultry products inspected, 1970-1974[1]/

| Product | 1970 | 1971 | 1972 | 1973 | 1974 |
|---|---|---|---|---|---|
| | (Million pounds) | | | | |
| Meat products | 52,276 | 53,706 | 52,954 | 50,552 | 54,259 |
| Poultry products | 15,343 | 17,269 | 19,516 | 22,035 | 18,723 |
| TOTAL | 67,619 | 70,975 | 72,470 | 72,557 | 72,982 |

1/ These data represent the total weight of finished products including the weight of nonmeat ingredients. In addition, there is some double counting of complex products which require inspection at intermediate steps in production.

## SURVEILLANCE AND COMPLIANCE ACTIVITIES

The Compliance Staff is responsible for enforcing registration and recordkeeping requirements and identifying possible violations of the meat and poultry inspection laws. The Compliance Staff is also responsible for initiating detention actions to control adulterated, misbranded, and uninspected product found in distribution channels, and for systematic operations review of all federally inspected establishments.

In 1974, periodic surveillance of persons and firms engaged in the meat and poultry and allied industries (wholesalers, brokers, animal food processors, renderers, warehouses) continued. During the year, 43,163 compliance reviews were made at these business locations. Many of these reviews were scheduled under a planned program to systematically review firms on the basis of their past compliance with the laws. Those in a high risk category, based on past violations, are visited more frequently.

In 1974, the Compliance Staff documented 845 alleged violations of the meat and poultry inspection Acts. Some of these cases involved more than one

alleged violator. Minor violations involving firms or individuals with no past history of violations are closed with letters of warning. In 1974, 955 letters were issued. These letters have proved generally effective in insuring future compliance. Serious violations or repeat violations by firms or individuals showing noncompliance are referred for prosecution. During 1974, 14 prosecutions were successfully completed. Examples of completed prosecutions under the Acts include cases involving adulteration of product resulting from rodent contamination while the product was in storage, in two separate cases, and sale of product adulterated with sulfites, in one case. In one of these cases, carcasses were misrepresented as federally inspected through the application of a facsimile of the marks of USDA inspection. Other offenses prosecuted included selling sheep meat misbranded as veal, detaching official inspection marks, and assaulting a Federal official.

Compliance officers also completed detention actions involving almost 9.7 million pounds of product. The product is normally brought into compliance or, if unwholesome, destroyed for food purposes. If voluntary dispositions are not made, seizure and disposition by Federal courts are necessary. In 1974, two seizures involving 1,719 pounds of product were made. One of these seizures involved over 1,400 pounds of horsemeat which had been offered for sale as beef. The Compliance Staff also participated in monitoring three recalls involving 264,027 pounds of product. One recall involved meat and poultry products containing mushrooms suspected of bacterial contamination. Another involved perishable canned hams voluntarily recalled by the processor due to suspected time and temperature abuse after the product left the official establishment. The third recall involved beef stew with botulism contamination.

The Compliance Staff also conducted 1,393 reviews of the adequacy of inspection in federally inspected establishments. These reviews are also conducted on a systematic basis with followup reviews based on the numbers of deficiencies found in previous visits. Reports of deficiencies are given to local program managers for immediate corrections and to headquarters managers for long-range improvements.

The Compliance Staff continued cooperative Federal-State development and training programs for intrastate compliance activities. Standards for "equal to" compliance programs were developed and well received by participating States. Cooperative intrastate compliance programs are conducted in 36 States.

Table 7--Compliance staff activities, 1970-1974

| Type of Action | 1970 | 1971 | 1972 | 1973 | 1974 |
|---|---|---|---|---|---|
| Compliance reviews conducted | 22,014 | 23,408 | 28,844 | 33,880 | 43,163 |
| ✓Apparent violations detected | 693 | 811 | 669 | 789 | 845 |
| Letters of warning issued | 679. | 708 | 807 | 868 | 955 |
| Cases referred to Department Office of Investigation | 57 | 46 | 53 | 52 | 51 |
| Cases referred to Department Office of General Counsel | 96 | 72 | 54 | 95 | 79 |
| Cases referred to Department of Justice by General Counsel | 46 | 38 | 26 | 40 | 38 |
| ✓Cases prosecuted by Department of Justice | 8 | 12 | 11 | 11 | 14 |
| Detention actions on product | 666 | 672 | 640 | 793 | 769 |
| Establishments reviewed | | | | 806 | 1,393 |

## ADMINISTRATIVE OFFICE OF THE
## UNITED STATES COURTS
### SUPREME COURT BUILDING
### WASHINGTON, D.C. 20544

ROWLAND F. KIRKS
DIRECTOR

WILLIAM E. FOLEY
DEPUTY DIRECTOR

WILLIAM E. DAVIS
CHIEF OF THE DIVISION OF
INFORMATION SYSTEMS

March 24, 1976

Honorable Judge John W. Oliver
U.S. Courthouse
811 Grand Avenue
Kansas City, Missouri 64106

Dear Judge Oliver:

Thanks to the fine cooperation of the Inspection Compliance Service in the Department of Agriculture the enclosed information was furnished.

I was under the impression that there were more prosecutions for meat inspection violations, but with the demise of small slaughter houses it appears that the figures are representative.

Hope the material is helpful.

Sincerely yours,

James A. McCafferty
Chief, Statistical Analysis
and Reports Branch

Attachment

Prosecutions Resulting in Conviction for Violation
of Federal Meat Inspection Standards Administrated
by the U.S. Department of Agriculture
Fiscal Year 1975

| | Prosecutions | Defendant |
|---|---|---|
| Total ------------------------------------------------- | 12 | 18 |
| Preparation of non-Federally inspected meat | 4 | 6 |

1  Received $2,000 fine
1  Received $250 fine and 1 year probation
1  Received $250 fine 1 year sentence to
    imprisonment suspended, 1 year probation
1  Received $100 and 1 year imprisonment
2  Received suspended sentence, 9 months
    probation

| | Prosecutions | Defendant |
|---|---|---|
| Misbranded product sold and transported interstate | 2 | 2 |

1  Company received $600 fine
1  Individual received $100 fine

| | Prosecutions | Defendant |
|---|---|---|
| Adulterated product | 2 | 5 |

1  Received $5,000 fine and 60 days in jail
3  Individuals received $1,000 fine, 1 year
    sentence to jail suspended, 2 years
    probation imposed
1  Firm for the above received $10.00 fine

| | Prosecutions | Defendant |
|---|---|---|
| Unauthorized use of Federal inspection mark | 1 | 2 |

1  Individual (owner) received fine of $1,600.
    Firm also fined $1,600

| | Prosecutions | Defendant |
|---|---|---|
| Falsification of registration for application for inspection | 1 | 1 |

1  Individual fined $10,000 and 18 months
    sentence to imprisonment.  (Note this
    defendant had prior record)

| | Prosecutions | Defendant |
|---|---|---|
| Illegal possession of official Federal branding device | 1 | 1 |

1  Firm fined $1,000 and costs

| | Prosecutions | Defendant |
|---|---|---|
| Transportation and sale of non-Federally inspected adulterated meat with intent to defraud (44 counts) | 1 | 1 |

1  Individual, fined $4,000 and sentenced to
    imprisonment 2 to 6 years